UNITED STATES of America, Plaintiff,

v.

FUNDS HELD IN the NAME OR FOR the BENEFIT OF John Hugh WETTERER, and/or Asociacion Amigos Del Los Ninos Hogar Mi Casa, a/k/a Mi Casa, At Bank of America International, Lloyds Bank International and Sterling Bank, Including but not Limited to Bank of America Account Numbers IF 1119–9984, 162232 IBF, 10201–01–1, and 6–58–05616, Lloyds Bank International Bank Number 00070891 (Nassau Branch) and Sterling Bank Account Numbers 907–103 and CD 15590 and all Related Accounts and Funds, Defendants.

No. CV 91–0234 (ADS).

United States District Court, E.D. New York.

Sept. 18, 1995.

Zachary W. Carter, United States Attorney, Eastern District of New York, by Gary R. Brown, Asst. U.S. Attorney, Brooklyn, NY, for Plaintiff.

Stanley L. Shapiro, Asociacion Los Amigos Hogar Mi Casa (Patricia N. Gillard, of counsel), Miller Place, NY, for Claimant.

## OPINION AND ORDER RE: REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

SPATT, District Judge:

Before the Court are the objections of the claimant Asociacion Los Amigos Hogar Mi Casa ("Asociacion" or "claimant") to the Report and Recommendation of United States Magistrate Judge A. Simon Chrein dated May 13, 1994 ("Report"). Judge Chrein's Report recommends striking the Asociacion's claim to certain bank accounts held in its name or in the name of John H. Wetterer ("Wetterer") which were seized by the United States ("Government").

According to the Government, the bank accounts were seized because they allegedly contain the proceeds of criminal activities conducted by Wetterer, who is a fugitive under indictment in the United States for mail fraud. The Government contends that the Asociacion is barred from filing a claim for the proceeds of these accounts because it is Wetterer's alter-ego. The Court referred the matter to the Magistrate Judge for a hearing and recommendation on the issue of whether the Asociacion is Wetterer's alter ego.

After conducting an evidentiary hearing Judge Chrein determined that the subject bank accounts were used by Wetterer for personal purposes and in a manner which rendered the corporate form of the Asociacion a fiction. Accordingly, Judge Chrein concluded that the Asociacion was Wetterer's alter-ego, and he recommended to this Court that the Asociacion's claim to the bank accounts be stricken.

### BACKGROUND

The Asociacion is a not-for-profit corporation incorporated under the laws of Guatemala on July 10, 1984, with its main offices located in Guatemala City. According to its By–Laws, the objective of the Asociacion is to promote the welfare of orphaned or abandoned children in Guatemala by providing them with food, shelter, education and other support services. Among the facilities for children run by the Asociacion is a live-in facility for orphaned or abandoned boys in Guatemala City, named Mi Casa.

Pursuant to its By–Laws, the Asociacion's Board of Directors ("Board") consists of four members. At the time that the incidents underlying this action occurred, the Asociacion's Board included: Wetterer, who, until 1991, served as President of the Board and of the Asociacion, and as Director General of Mi Casa; Arne Sapper ("Sapper"), a Guatemalan businessman who served as Vice–President of the Board; Gonzalo Menendez, the Guatemalan Foreign Minister; and Edna Ibarquen, a member of Guatemalan society. In addition, there is an Advisory Board which advises the Asociacion on particular matters that may arise. The Asociacion also maintains a Texas Board of Directors ("Texas Board"), whose purpose is to allow donations from the United States to receive tax exempt status.

Until November 1988, funds for Mi Casa were solicited in the United States and elsewhere under the auspices of the American Friends of Children ("AFC"). AFC is the successor organization to American Friends of Vietnamese Children, founded in 1970 by Wetterer and Dan Mackey ("Mackey"), a resident of Long Island and former New York City Police Officer. According to Mackey, who served as AFC's treasurer, Wetterer solicited donations by sending a monthly letter on AFC stationary to sponsors and potential donors informing and updating them of events and occurrences at Mi Casa. Donations were made to AFC, and sent in a return envelope provided by it to AFC's post office box number in Massapequa, New York. AFC would then deposit the donations in Bank of America Account No. 05616, located in Florida and held in the name of the Asociacion. Subsequent to deposit, Wetterer would arrange a transfer of the funds to Guatemala. From 1977 through 1988, Mackey estimates that AFC collected and disbursed over one million dollars to Wetterer.

In 1988, the television news program Sixty Minutes received information that Wetterer was sexually abusing the young boys at Mi Casa. Sixty Minutes investigated the allegations, and discovered what it described as a

chronic and extensive system of sexual abuse by Wetterer at Mi Casa. This information was passed on to the AFC Board, which attempted to conduct its own investigation of the matter. According to Mackey, AFC's investigator was prevented by Wetterer from conducting any meaningful interviews of the boys at Mi Casa. As a result, AFC stopped allowing Wetterer to use AFC's letterhead to raise funds for Mi Casa, and discontinued sending donations to him.

In 1989, the United States Postal Service ("Postal Service") began its own investigation into the allegations concerning Wetterer. The investigation was conducted by Postal Inspector John McDermott ("McDermott"). According to McDermott, his investigation revealed that Wetterer was a pedophile who systematically and regularly molested and otherwise sexually abused the young boys residing at Mi Casa. McDermott's investigation further revealed that at the time Wetterer was abusing the boys at Mi Casa, his monthly letters to sponsors and donors in the United States contained false representations that a healthy and stable environment was being provided to the boys at Mi Casa as a result of the donations. McDermott also discovered that on several occasions Wetterer brought some of the boys residing at Mi Casa to Disney World in Florida, allegedly to entice them to engage in sexual activity with him, or to reward them for such activity. Finally, McDermott discovered that Wetterer was continuing to solicit donations for Mi Casa through the United States mail. According to McDermott, beginning in early 1989 Wetterer started using a letterhead that resembled AFC's to solicit donations, which listed a post office box in Texas for returning the donations.

On September 14, 1990 McDermott filed a criminal complaint against Wetterer, which resulted in a warrant being issued for Wetterer's arrest and two indictments being filed against him. The first indictment was for violation of the mail fraud statute, 18 U.S.C. § 1341, based on Wetterer's fraudulent representations in the monthly donation solicitation letters that a healthy environment was being provided to the boys at Mi Casa. The second indictment was for theft and conversion of funds, based on certain transfers of funds Wetterer made to his brother. Wetterer was notified of the arrest warrant but refused to appear and answer the charges filed against him. He continues to remain a fugitive in Guatemala, a country with which the United States does not have an extradition treaty. According to Sapper, Wetterer continues to be the president of the Asociacion's board of directors, but has ceased being the director general of Mi Casa.

On January 22, 1991, the United States commenced the instant action, seeking the forfeiture of certain bank accounts held in the name of the Asociacion or Wetterer pursuant to 18 U.S.C. § 981. The *in rem* complaint listed as the alleged crimes underlying the basis for the seizure mail fraud, 18 U.S.C. § 1341, and inducing a person to travel in interstate or foreign commerce for the purpose of engaging in criminal sexual activity, 18 U.S.C. § 2422. An arrest warrant *in rem* authorizing the seizure of the bank accounts was issued that same day. In response to the seizure, the Asociacion filed a claim to all of the funds seized in this action. The claim covers the following accounts: (1) Sterling Bank (Texas) accounts 020–907–103 and CD 15590; (2) Bank of America (Florida) accounts IF 1119–9984, IF 1622321, IBF 10201–01–1, and 6–58–05616; and (3) Lloyds International (New York) account 000 70891.

According to the Asociacion's claim, all of the seized accounts are in the name of the Asociacion, and contain Asociacion monies deposited for the use and benefit of the Asociacion. The claim also contends that although Sterling Bank CD 15590 is in Wetterer's name, the money in that CD belongs to the Asociacion because (i) the CD was established with money taken from another Asociacion account for the purposes of not exceeding the Federal Deposit Insurance Company's ("FDIC's") insurance limit of $100,000 per account, and (ii) Wetterer assigned the CD to the Asociacion of February 1, 1991.

In response to the Asociacion's claim, the United States filed a motion to strike the claim of the Asociacion on April 4, 1991. The grounds for the Government's motion related to the contention that the Asociacion did not

have standing to file a claim for the seized funds. First, the Government contended that the Asociacion lacked standing to file its claim, because it failed to follow Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims. Rule C(6) requires, among other things, that persons claiming they are entitled to possession of the seized property must state in their claim that they are duly authorized to make the claim. According to the Government, the Asociacion's By–Laws only authorize the President, who was Wetterer, to undertake judicial proceedings on behalf of the Asociacion. However, the Asociacion's claim was signed by Sapper, the Asociacion's Vice–President, who allegedly was unauthorized to undertake judicial action on behalf of the Asociacion.

Second, the Government contended that the Asociacion could not file a claim for funds held in the name of Wetterer, because he was a fugitive and was disentitled to contest any matter in the forfeiture case. Moreover, the Government contended that Wetterer could not properly assign the Sterling Bank CD in his name to the Asociacion, because at the time of the assignment the funds were already seized.

In response the Asociacion contended that it had standing to file a claim, because, among other arguments, it was a separate legal entity from Wetterer and his acts could not be attributed to the Asociacion. According to the Asociacion, it was not indicted or implicated in Wetterer's crimes, and thus could rightfully file a claim for the seized funds belonging to it as a corporate claimant. The Government's reply to this particular contention was that the Asociacion was Wetterer's alter ego, a mere shell entity completely dominated and controlled by Wetterer for the purpose of effectuating his fraudulent scheme regarding the donations to Mi Casa. The Government contended that as an alter ego to Wetterer, the Asociacion stood in Wetterer's shoes and was disentitled to file a claim in this action because of Wetterer's fugitive status. If its motion to strike the Asociacion's claim was not granted on the basis that the Asociacion did not have standing to file the claim, then the Government requested to the Court that a hearing should be held to determine whether the Asociacion was Wetterer's alter ego, so that its claim could be stricken on that basis.

On April 12, 1991, the Court denied the Government's motion to strike the Asociacion's claim on the basis that the Asociacion failed to comply with Rule C(6), and on the basis that the assignment by Wetterer of the CD account was not valid. The Court then referred the matter to United States Magistrate Judge Michael L. Orenstein for an evidentiary hearing, to report and recommend on the issue of whether the Asociacion was the alter ego of Wetterer and, thus, could not pursue its claim.

A six month stay of all proceedings in this case was subsequently imposed, on account of the related criminal proceedings against Wetterer. Thereafter, Judge Orenstein recused himself from the case, and Judge Chrein was reassigned as the Magistrate Judge.

### FINDINGS AND CONCLUSIONS BY JUDGE CHREIN

At a one day hearing held on May 12, 1993, Judge Chrein heard the Government's arguments in support of its motion to strike the claim of the Asociacion. As previously stated, the purpose of the hearing was to determine whether the claim of the Asociacion should be stricken because the Asociacion is the alter ego of Wetterer. Upon the conclusion of the civil hearing and consideration of the pre and post-hearing memoranda of law, Judge Chrein held that the Asociacion is the alter ego of Wetterer and recommended that the claim of the Asociacion be stricken.

Judge Chrein first determined that under New York's choice of law rules, New York had the greatest interest with respect to the seizure of the bank accounts. Although the Asociacion contended that Guatemalan law should apply, Judge Chrein stated that he was never provided with the law of Guatemala. He then held that, "since the actual seizure of the funds would be in New York, New York law should be applied in this case." Report at 3. He also concluded that the law of Texas and Florida regarding piercing the corporate veil was similar to New York's law.

■ Having determined the law to apply to resolve the issue before him, Judge Chrein then reviewed the criteria needed to pierce the corporate veil under New York law. These criteria are set forth in the seminal case *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir.1991), which held that under New York law, a corporation's veil may be pierced upon a showing that "control and dominion was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act." In order to determine whether the corporation is dominated by an individual, the Second Circuit in *Passalacqua* explained that the trier of fact should consider the following factors: 1) the absence of corporate formalities; 2) inadequate capitalization; 3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; 4) overlap in ownership; 5) common office space, address and telephone numbers of corporate entities; 6) the amount of business discretion displayed by the allegedly dominated company; 7) whether the corporations deal with each other at arms length; 8) whether the allegedly dominated corporation is treated as an independent profit center; 9) the payment of debts and guarantees by the parent for the benefit of the subsidiary; and 10) whether the subsidiary uses property of the parent as if it were its own. *Id.* at 139.

Judge Chrein concluded that the third *Passalacqua* factor presented the strongest evidence of the absence of a separate identity between Wetterer and the Asociacion. Moreover, in his view there was persuasive evidence of a lack of corporate formality with regard to various transfers of funds from the Asociacion's accounts to Wetterer, which further supported the Government's assertion that the Asociacion was Wetterer's alter ego. Judge Chrein based his conclusions on four transactions involving transfers from the seized bank accounts.

The first transaction involved the transfer of $60,000 on February 3, 1987, from the Bank of America Account No. 05616 in the name of the Asociacion, to Gary Wetterer, Wetterer's brother. The funds were used for improvements on Gary Wetterer's water-front property in Babylon, New York. The Asociacion contended that the transfer was a loan to Gary Wetterer in exchange for a $60,000 Certificate of Deposit ("CD") bearing a higher interest rate than the bank account's rate.

The Asociacion's contention that the transfer was a loan was rejected by Judge Chrein. He found that the amount of checks offered by Sapper during the hearing as evidence of the loan repayment did not amount to $60,000, but to $78,686.87, and that Sapper could not confirm that the checks were actually repayments by Gary Wetterer for the loan. Moreover, Judge Chrein found that the transaction was not recorded in the corporate minutes of the Asociacion, and that there was no written instrument such as a loan agreement or promissory note recording the transaction as loan. According to Judge Chrein, the transaction was not an arms length transaction, but was the "sort of transaction that supports the contention that the corporation was really Wetterer's alter ego." Report at 7.

The second transaction Judge Chrein reviewed were the following three annual tuition payments in August of 1987, 1988 and 1989, from the Bank of America Account No. 05616 in the name of the Asociacion, to the Knox School for Wetterer's son 1) $7,070 on August 13, 1987; 2) $7,725 on August 11, 1988; and 3) $2,275 on August 24, 1989. The Asociacion contended that it provided Wetterer's son with an education, because Wetterer never received a salary and his son was equally entitled to an education as were the other boys at Mi Casa.

Judge Chrein rejected this contention as well, finding that the absence of any salary to Wetterer was persuasive evidence that the Asociacion was Wetterer's alter ego. According to Judge Chrein, "Wetterer did not need to draw a salary since he had the assets of the Asociacion to call upon for his personal needs." Report at 8.

The third transaction reviewed by Judge Chrein was the transfer of $30,000 on May 9, 1989, from the Bank of America Account No. 05616 in the name of the Asociacion, to a CD at Sterling Bank in Wetterer's name. The Asociacion contended that this transfer was

approved in order to avoid the Federal Deposit Insurance Corporation's ("FDIC's") $100,000 limit for insured accounts.

Judge Chrein did not find this explanation of the transfer to be credible, in light of Sapper's testimony at the hearing that the balance in the Asociacion's other accounts at Sterling Bank exceeded the $100,000 FDIC limit every month from June 1989 until September 1990. Judge Chrein noted that the balance of Bank of America Account No. 05616 was far less than $100,000 during the same time. He concluded that "this commingling of funds between the Asociacion and Wetterer strongly suggests that the corporate funds were used by Wetterer for his personal purposes." Report at 9.

The fourth transaction Judge Chrein reviewed was the payment from the Asociacion's accounts to Jeffrey Waller, Esq. ("Waller"). According to testimony from Sapper and McDermott, Waller is the attorney retained by the Asociacion to represent it in determining whether to sue *60 Minutes* regarding their allegations of sexual abuse by Wetterer, and to represent Wetterer on the mail fraud charge. Two payments were made to Waller: 1) $10,000 on June 13, 1989 from Bank of America Account No. 05616 in the name of the Asociacion; and 2) $15,000 on September 21, 1990 from Sterling Bank Account No. 907–103 in the name of the Asociacion.

Judge Chrein found that these two payments served as additional evidence of the ability of Wetterer to use the Asociacion's funds for his own purposes, because the transaction was not recorded in the Asociacion's corporate minutes, and Sapper admitted during his testimony that part of the $15,000 payment was connected to the arrest warrant issued for Wetterer.

Based on all the evidence before him, Judge Chrein concluded there was ample evidence to suggest that the Asociacion was being used by Wetterer for personal purposes in a manner which rendered its corporate form a fiction, and he recommended to the Court that the Asociacion's claim be stricken.

## THE ASOCIACION'S OBJECTIONS

The Asociacion contends that Judge Chrein's Report is flawed, and contains omissions in material findings which, if corrected, would uphold the Asociacion's claim.

. Specifically, the Asociacion makes the following objections to the Report:

1. Judge Chrein incorrectly states that the Asociacion is a Guatemalan corporation with a Texas Board of Directors;

2. Notwithstanding the application of New York law to determine the issue at hand, Judge Chrein failed to consider the law of Guatemala which governs the conduct of Not-for-Profit corporations, including what kind of corporate formalities must be kept by such corporations;

3. Judge Chrein committed legal error by relying on only one of the ten factors enumerated in *Passalacqua*, rather than conducting a balancing test of all of the enumerated *Passalacqua* factors.

4. Judge Chrein erred in concluding that the willingness of Wetterer to forego a salary for his work at Mi Casa strongly suggests that he was using corporate funds for his own purpose.

5. Judge Chrein failed to consider testimony indicating that the Asociacion kept certain corporate formalities.

In addition to the above, the Asociacion objects to the findings and conclusions regarding each of the four transactions reviewed by Judge Chrein. These objections will be discussed below, upon review each of the transactions.

## DISCUSSION

### 1. Applicable Standard of Review.

According to the statutory provisions governing the powers of a United States Magistrate Judge, a district judge may designate a magistrate judge to hear and determine any pre-trial matter pending before the court, except certain dispositive matters such as motions to dismiss or for summary judgment. *See* 28 U.S.C. § 636(b)(1)(A). In cases involving these latter-kind matters that are excepted from a hearing and determination by the magistrate judge, the district court

may designate the magistrate judge to conduct an evidentiary hearing on the matter, and to submit proposed findings of fact and recommendations to the district court. 28 U.S.C. § 636(b)(1)(B). The instant reference to Judge Chrein concerns a dispositive issue, because a finding that the Asociacion is Wetterer's alter ego can result in dismissing the Asociacion's claim.

The statute requires that with respect to proposed findings and recommendations made under section 636(b)(1)(B), the district court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made," and that the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *See* 28 U.S.C. § 636(b)(1)(C).

■ In order to make a sufficient *de novo* determination under the statute, the district court must conduct an independent review of all objections and responses to the magistrate's findings and recommendations. *See, e.g., United States v. Tortora,* 30 F.3d 334, 337 (2d Cir.1994); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1045 (2d Cir.1992). By using the phrase *de novo* determination, however, rather than *de novo* hearing, Congress intended " 'to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.' " *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989) (quoting *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980)). Thus, the statute does not require the district court to rehear the contested testimony in order to make its determination. *Grassia,* 892 F.2d at 19 (citing *Raddatz,* 447 U.S. at 674, 100 S.Ct. at 2411).

### 2. The Disentitlement Doctrine.

Prior to addressing the claimant's objections, some discussion of the disentitlement doctrine is required, in order to clarify certain threshold issues, as well as the nature of the issue before this Court.

■ The disentitlement doctrine provides in essence that one who is a fugitive from justice cannot seek relief from the judicial system the authority of which he or she is evading. Although traditionally applied to criminal appeals and proceedings, some United States Courts of Appeals, including the Second Circuit, have extended application of the doctrine to civil proceedings, including civil forfeitures, related to the criminal proceeding. *See United States v. Forty–Five Thousand Nine Hundred Forty Dollars in U.S. Currency,* 739 F.2d 792 (2d Cir.1984); *United States v. $40,877.59 in U.S. Currency,* 32 F.3d 1151, 1152–53 (7th Cir.1994) (describing the split among the circuit courts with regard to extending the doctrine to civil matters). As applied in the context of a civil forfeiture, the doctrine means that a fugitive may not invoke the power of the court to preserve his or her right to property in a civil forfeiture proceeding while at the same time flaunting the court's criminal processes.

Substantively, the present matter concerns the Government's challenge to the Asociacion's ability to maintain a claim against the seized accounts. The Court wishes to emphasize that the present matter is *not* concerned with the Government's establishing probable cause for the seizure, nor with establishing that the funds in the accounts are proceeds traceable to the crimes allegedly committed by Wetterer. Neither is the present proceeding one where the claimant is asserting a defense to the seizure as an "innocent owner" under 18 U.S.C. § 981(a)(2). Whether and to what extent the funds are subject to seizure, and any defenses thereto, are matters that may be subsequently addressed by the parties, if the Court finds that the Asociacion can maintain a claim challenging the seizure.

The Government has framed the issue presented here in terms of the Asociacion's standing. However, the issue is not one of standing. The Government's allegations that the claimant lacked standing because (i) it failed to meet the provisions of Rule C(6), or (ii) the claimant does not have a sufficient possessory interest in the seized *res,* have already been decided by the Court's April 12,

1991 decision denying the Government's motion to strike the claim on those grounds.

■ Rather, the issue here is the applicability of the disentitlement doctrine to the Asociacion's claim, and is more correctly framed in terms of whether, despite having standing, the Asociacion is disentitled from pursuing its claim against the seized accounts because it is the alleged alter ego of a fugitive. *See United States v. Eng*, 951 F.2d 461, 464 (2d Cir.1991) (explaining that a claimant who fails to abide by the procedures for properly filing a claim lacks statutory standing in a civil forfeiture, while a claimant who is a fugitive is only disentitled from being heard in the civil forfeiture). The distinction between lack of standing and disentitlement is significant, because among other consequences, disentitlement to maintain a claim in a forfeiture is not jurisdictional, *id.*, and is a matter left to the discretion of the Court. *Id.* at 467.

■ Further, the Court believes that as a threshold matter, it must determine whether the disentitlement doctrine can be applied in the present situation against a corporate claimant. Although the Second Circuit has ruled that a fugitive loses his or her ability to challenge a forfeiture of his or her property under the disentitlement doctrine, *see Eng*, 951 F.2d at 465–66, it has not squarely addressed, and neither has any other Circuit Court or the United States Supreme Court addressed, whether the doctrine can be applied against a corporation challenging the seizure of its assets, where the corporation is alleged to be the shell or alter ego of the fugitive.

Only two district courts have addressed the issue. In the first, *United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith*, 801 F.Supp. 984, 998–999 (E.D.N.Y. 1992), *aff'd sub nom. United States v. Daccarett*, 6 F.3d 37 (2d Cir.1993), Judge Weinstein declined to apply the disentitlement doctrine in an exercise of his discretion to the situation before him; involving various corporations alleged to be controlled by the fugitive. The reasons he gave for exercising his discretion in favor of the corporate claimants were: (1) no credible evidence had been submitted demonstrating that the fugitive controlled any claimant, or that the fugitive will receive the benefit of the proceeds returned to the claimant; (2) there was no evidence to suggest that the fugitive was flouting the judicial system in the forfeiture case; and (3) the civil forfeiture was independent of the criminal case pending against the fugitive, because the basis for the underlying indictment of the fugitive was a tax violation, while the basis for the forfeiture was the fugitive's drug money-laundering activities. *Id.* at 999.

Although Judge Weinstein's decision was affirmed, the issue of the applicability of the disentitlement doctrine was not raised or considered on appeal. However, this Court notes that in a later decision in which the Second Circuit reviewed the extension of the disentitlement doctrine to civil proceedings, the Second Circuit described the decision in *All Funds on Deposit in Any Accounts Maintained at Merrill Lynch* as one where the district court "declin[ed] to apply [the] doctrine to corporations allegedly controlled by [the] fugitive when 'no credible evidence' of that control [was] presented." *United States v. Bravo*, 10 F.3d 79, 83–84 (2d Cir. 1993).

The second district court to address the issue found that the disentitlement doctrine was applicable to strike the claim of a corporation that was the shell or alter ego of a fugitive. *See United States v. Contents of Accounts Nos. 3034504504*, No. CV 90–1262 (D.N.J. April 5, 1991), *aff'd*, 971 F.2d 974 (3d Cir.1992), *cert. denied sub nom., Friko Corp. v. United States*, —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). In that case, the court agreed with the government that "it would be both improper and contrary to public policy for a fugitive to maintain or preserve property which would otherwise be subject to forfeiture by simply authorizing a corporation which he dominates to enter the jurisdiction and assert the claim on the fugitive's behalf." *Id.*, slip op. at 10.

In affirming the district court's decision, the Third Circuit did not reach the issue of whether the shell corporation of a fugitive may also be disentitled from pursuing its claim in a civil forfeiture proceeding. How-

ever, the Third Circuit believed that under the holding of *Eng,* application of the disentitlement doctrine to the claim of the alter ego company of a fugitive is "persuasive". *See Contents of Accounts Nos. 3034504504,* 971 F.2d at 986 n. 9; *see also United States v. One 1973 Rolls Royce,* 43 F.3d 794, 806 n. 8 (3d Cir.1994) (citing with approval the holding of *Contents of Accounts Nos. 3034504504* that "a corporation that had legal title to property but which was merely an alter ego and a straw owner, lacked standing to challenge the forfeiture.").

Based on the above authority, this Court believes that in this Circuit a district court can, in the exercise of its discretion and in the appropriate circumstances, apply the disentitlement doctrine in a civil forfeiture proceeding to the claim of a corporation alleged to be the alter ego of a fugitive. The Court further believes that the fundamental consideration in determining whether to exercise its discretion and apply the doctrine in such a situation is the extent of control over the corporation exercised by the fugitive, or put another way, the extent of independent dominion and control the corporation has over its assets. *Accord All Funds on Deposit in Any Accounts Maintained at Merrill Lynch,* 801 F.Supp. at 999; *Contents of Accounts Nos. 3034504504,* 971 F.2d at 985–86 & n. 9.

■ Finally, the Court emphasizes that although a finding that the corporate entity is the fugitive's alter ego is necessary in order to apply the disentitlement doctrine, such a finding is not dispositive of whether, in the exercise of its discretion, the Court will apply the disentitlement doctrine to any given situation. The Court believes that other equitable factors may be considered which militate against application of the doctrine.

### 3. Choice of Law.

Prior to discussing the claimant's objections, it is also necessary to review the claimant's contentions regarding the choice of law, and to discuss the choice of law rules governing civil forfeitures.

Before Judge Chrein, the Asociacion argued that he should apply Guatemalan law to determine the issue of whether the Asocia-

cion is Wetterer's alter ego, because the Asociacion was formed in Guatemala, and the seized accounts belong to a Guatemalan corporation. In the alternative, the Asociacion argued that, if Guatemalan law was not chosen, then Texas and Florida law should apply and not New York law, because the seized accounts were in Texas and Florida, and therefore these two states had more significant interests in the matter than New York. *See* Defendant's Pre–Trial Memorandum of Law at 13.

However, the Asociacion recognized that the laws of Texas, Florida and New York were similar on the issue of when one entity can be considered the alter ego of another, and therefore, practically speaking, the law of any one of those states could be used to determine the alter ego issue. Defendant's Pre–Trial Memorandum at 16.

Judge Chrein analyzed the choice-of-law issue by first stating that a federal court sitting in diversity looks to the choice-of-law of the forum state. He then summarized the New York choice-of-law principle to be employed in the absence of an express contractual provision by the parties; namely, that the law of the jurisdiction with the greatest interest in the application of its laws should be applied. Report at 2.

Judge Chrein rejected the defendant's contention that Guatemala is the jurisdiction that has the greatest interest with regard to the seizure of the accounts, and therefore that its law should apply. Among other reasons, he stated that the plaintiff failed to provide him with Guatemalan law on the issue. Instead, Judge Chrein determined that "since the actual seizure of the funds would be in New York, New York law should apply." Significantly, Judge Chrein determined that the law of the two other fora with interests in the matter, Texas and Florida, did not materially differ from New York law on the issue of piercing the corporate veil. Report at 3–4. Guided by these principles, Judge Chrein then analyzed the alter ego issue by applying the ten factor test set forth by the Second Circuit in *Passalacqua.*

While this Court ultimately agrees with the end result reached by Judge Chrein, namely that the issue of whether the Asocia-

cion is Wetterer's alter ego can be analyzed by application of the *Passalacqua* factors, it believes that in order to reach this result a different analysis than the one undertaken by Judge Chrein must be employed.

■ In this case, the Court does not sit in its diversity jurisdiction. Rather, it sits in its federal question jurisdiction. The issue of whether the Asociacion is not entitled to maintain a claim and challenge the seizure of its accounts because it is the alter ego of the fugitive Wetterer, is a question of federal law in the first instance, not state law.

However, in the Court's view the issue of whether a corporation is the alter ego of the fugitive for the purposes of becoming disentitled to maintain a claim in a forfeiture proceeding is an issue of federal law that is determined by reference to state law, provided the state law does not conflict with the federal statute. *See, e.g., One 1973 Rolls Royce*, 43 F.3d at 806–07 n. 8 (although state law defines the ownership interest in the property seized that is subject to forfeiture, the reliance on state law is "most accurately defined as incorporation of state law as part of the federal common law."); *cf. United States v. BCCI Holdings (Luxembourg), S.A.*, 833 F.Supp. 32, 40 (D.D.C.1993) (whether claimant has an interest in property subject to criminal forfeiture under the RICO statute is determined by reference to state law).

■ Since the issue is one of federal law, the federal choice-of-law rule must be used by the Court to determine which state law will supply the rule of decision regarding the Asociacion's alter ego status vis-a-vis Wetterer. *BCCI Holdings*, 833 F.Supp. at 40 (applying federal choice-of-law rule and deciding that Bangladesh law should be applied to determine interest in seized property). *Cf. In re Koreag, Controle Et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992) ("[F]ederal principles should guide our consideration of which jurisdiction's substantive law applies in cases arising out of federal law;" applying federal choice of law rules in bankruptcy context).

■ The federal common law choice-of-law rule is to apply the law of the jurisdiction

having the greatest interest in the litigation. The goal of this analysis "is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent." *Koreag*, 961 F.2d at 350; *accord BCCI Holdings*, 833 F.Supp. at 40; *United States v. 105,800 Shares of Common Stock*, 825 F.Supp. 191, 194 (N.D.Ill. 1993).

■ There are four jurisdictions with an interest in this controversy: New York, Texas, Florida and Guatemala. The Various contacts of each jurisdiction can be summarized as follows:

1. *New York.* New York's contacts with the present matter include: (i) being the original place of incorporation for AFC, the non-profit entity which sponsored Wetterer and Mia Casa, and under whose auspices donations were collected for Mi Casa and distributed to Wetterer between 1984 and 1988; (ii) New York residents were solicited by Wetterer, and in response to the solicitations contributed money to him; (iii) the mailing address and post office box where donations were sent until November, 1988 was in New York; and (iv) one of the bank accounts seized, but not at issue in the present matter, is located in New York.

In the Court's view, New York's laws and policies are implicated in this matter in several ways. First, New York has an interest in protecting its not-for-profit corporations and its residents from mail fraud and other fraudulent representations seeking contributions. Second, New York has an interest in ensuring its jurisdiction is not being used in any manner to further a mail fraud scheme. Third, New York has an interest in ensuring that corporations doing business in its jurisdiction are not the alter ego of a criminal, and that bank accounts located in its jurisdiction are not owned by the alter ego corporation of a criminal as a cover to perpetrate crimes and/or enjoy the proceeds of such crimes.

2. *Texas.* Texas's contacts with the present matter include: (i) two of the three bank accounts which were seized and challenged by the Asociacion's claim are located in Tex-

as; (ii) since 1989, Wetterer has been using a post office box located in Texas for receiving donations to Mi Casa; (iii) the Asociacion has a Texas Board which was created to allow tax-exempt status to donations received in the United States; and (iv) Texas residents are solicited to make donations to Wetterer.

In the Court's view, Texas's laws and policies are implicated in this matter in many of the same ways as New York's laws and policies. First, Texas has an interest in protecting its residents from mail fraud and other fraudulent representations seeking contributions. Second, Texas has an interest in ensuring that any Board of Directors created under its laws to further tax deductible donations is legitimate, and not being used in furtherance of mail fraud. Third, Texas has an interest in ensuring its jurisdiction is not being used in any manner to further a mail fraud scheme. Fourth, Texas has an interest in ensuring that corporations doing business in its jurisdiction are not the alter ego of a criminal, and that the seized bank accounts located in its jurisdiction are not owned by the alter ego corporation of a criminal as a cover to perpetrate crimes and/or enjoy the proceeds of such crimes.

3. *Florida.* Florida's contacts with the present matter include: (i) one of the three bank accounts seized and listed in the Asociacion's claim is located in Florida; (ii) donations from AFC's accounts in New York were transferred to a Florida account for eventual transfer to Wetterer in Guatemala; and (iii) Disney World is located in Florida.

The Court believes that Florida's laws and policies are implicated in this matter in several ways. First, Florida has an interest in ensuring its jurisdiction is not being used in any manner to further a mail fraud scheme. Second, like Texas and New York, Florida also has an interest in ensuring that corporations doing business in its jurisdiction are not the alter ego of a criminal, and that the seized bank accounts located in its jurisdiction are not owned by the alter ego corporation of a criminal as a cover to perpetrate crimes and/or enjoy the proceeds of such crimes. Third, Florida has an interest in ensuring that its jurisdiction is not being

used for the interstate transportation of minors for the purpose of sexual abuse.

4. *Guatemala.* Guatemala's contacts with the present matter include: (i) the Asociacion is a charitable, not-for-profit corporation organized under the laws of Guatemala, with a functioning Board of Directors located in Guatemala; (ii) the Asociacion allegedly owns the funds in the seized accounts; and (iii) the Asociacion's charitable work is the intended recipient of the donations sent to Wetterer.

The Court believes that Guatemala's laws and policies are implicated in this matter in the following ways. First, Guatemala has an interest in protecting the assets of its non-for-profit corporations from extraterritorial seizure. Second, Guatemala has an interest in ensuring that its not-for-profit corporations are not the alter ego of a criminal, and used as a cover to perpetrate mail fraud or sex crimes, and/or to enjoy the proceeds of such crimes. Third, Guatemala has an interest in ensuring that donations intended for the benefit of Mi Casa are received by Mi Casa.

In the Court's view, Texas and New York are the jurisdictions whose laws and policies are implicated to the greatest extent. Although Guatemala also has interests in this matter, its interests are not as greatly implicated as those of Texas and New York, because the present forfeiture action involves an underlying indictment brought against Wetterer in the United States alleging mail fraud conducted in the United States. Moreover the bank accounts were seized in the United States, and the donations in the seized accounts were from United States citizens. The Court notes that the interest of Guatemala in protecting the assets of its not-for-profit corporation from being seized is not insignificant. However, the Court believes that both the underlying basis for the civil forfeiture and the fact that the accounts were seized in the United States implicate the laws and policies of Texas and New York in this controversy to a greater extent than they implicate the laws and policies of Guatemala.

Similarly, although Florida has interests that are implicated in this case, the Court

believes that those interests are not as greatly implicated as the interests of Texas and New York. Among other reasons, Wetterer used post office boxes in Texas and New York to receive donations, and the two organizations through which the donations received tax-exempt status, AFC and the Texas Board, are respectively located in New York and Texas.

As between Texas and New York, the Court is of the view that Texas has the most significant interests in this case, because among other things two of the three accounts at issue here are in Texas, while none are in New York, and the Asociacion has a Texas Board of Directors. However, it is not necessary for the Court to conduct an interest analysis for the purposes of determining whether New York or Texas law should apply, because ultimately, as Judge Chrein correctly determined, the law of Texas and New York regarding when one entity is the alter ego of another is essentially the same.

■ Texas law recognizes three broad theories of disregarding the corporate form in order to pierce the corporate veil: (1) when the corporation is the alter ego of its owners or shareholders; (2) when the corporation is used for illegal purposes, and (3) when the corporation is used as a sham to perpetrate a fraud. *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.*, 30 F.3d 627, 629 (5th Cir.1994); *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir.1994).

■ Similarly, New York law recognizes that the corporate form may be disregarded "upon a showing of control by the dominating corporation that leads to a wrong against third parties." *Passalacqua*, 933 F.2d at 138; *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir.1990) ("New York law allows the corporate veil to be pierced *either* when there is fraud *or* when the corporation has been used as an alter ego.") (emphasis in original). *See also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir.1993).

■ Significantly, the test used to determine whether the alter ego theory can be used to disregard the corporate form is practically the same in both states. Under Texas law, alter ego is defined as when "a corporation is organized and operated as a mere tool or business conduit of another corporation." *Horizontal Drilling*, 11 F.3d at 68. *See also Thrift v. Hubbard*, 44 F.3d 348, 353 (5th Cir.1995) ("Alter ego applies when there is such unity or a blurring of identity between ... a corporation and an individual that the separateness of the single corporation has ceased[.]") (quoting *Coastal Shutters & Insulation, Inc. v. Derr*, 809 S.W.2d 916, 921 (Tex.App. Houston 1991)).

To show an alter ego under Texas law, "the total dealings of the corporation and the individual" must be considered, including such factors as,

> the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*Horizontal Drilling*, 11 F.3d at 68; *see also United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691–92 (5th Cir.1985). These factors correspond with the ten factors set forth by the Second Circuit in *Passalacqua* for determining an alter ego under New York law.

■ Although under Texas law failure to observe corporate formalities is no longer a factor in proving the alter ego theory in contract claims, that factor must still be considered in tort based claims. *Horizontal Drilling*, 11 F.3d at 68. The claims asserted here against the Asociacion, on which the seizure of its accounts is based and on which use of the alter ego theory is being premised, are the allegations of mail fraud and the related criminal activities of Wetterer. These claims are not contract-related claims. Rather, they are more akin to tort claims.

Accordingly, based on the above the Court will analyze whether the Asociacion is Wetterer's alter ego by primarily utilizing the factors set forth in *Passalacqua* and *Horizontal Drilling*. With these principles in mind, the Court shall consider each of the

Asociacion's objections regarding Judge Chrein's finding that the Asociacion is Wetterer's alter ego.

### 4. The Claimant's Objections.

A. *Failure to Consider Guatemalan Law.*

The Asociacion does not specifically object to Judge Chrein's choice of New York law to determine whether it is Wetterer's alter ego. Rather, it contends that Judge Chrein erred by failing to consider the not-for-profit corporation law of Guatemala in conjunction with which corporate formalities the Asociacion is required to maintain.

According to the Asociacion, under Guatemalan not-for-profit law it is not required to have a Secretary, much less maintain corporate minutes. To support its contention, the Asociacion submitted the affidavit of Fernando Linares Beltranena, a Guatemalan attorney. According to Mr. Beltranena, while most non profit associations have a book of minutes kept by the Secretary, the Guatemalan Civil Code does not require a book of minutes nor the position of Secretary of a board of directors. Thus, the Asociacion contends that it was erroneous for Judge Chrein to hold the Asociacion to corporate formalities required under New York law which were not required under Guatemalan law, such as recording certain payments or bank transfers in its corporate minutes.

 The Asociacion is correct in its contention that the corporate formalities the Asociacion is required to maintain are dictated by Guatemalan law and not New York or Texas law. However, its assertion that the formality of recording transactions in its minutes should not be considered in the determination of its alter ego status is unpersuasive, and belied by its own actions. The evidence adduced at the hearing reveals that the Asociacion did maintain corporate minutes and record transactions.

Article 19 of the Asociacion's By Laws (Plaintiff's Exh. 22) provides that the Asociacion's Board shall include a Secretary, whose functions, among other things, is to monitor the development of the Asociacion's activities. Mr. Beltranena conceded in his affidavit that notwithstanding the Guatemalan Civil Code's failure to mention a book of minutes, the common usage among associations in Guatemala is to use a book of minutes (called the "libro de actas"). Acting President Sapper testified that the Asociacion maintained a book of minutes, and recorded the Asociacion's activities in it. (Tr. at 249–250).

Accordingly, even though not required by the law of Guatemala, the corporate formality of recording transactions in a book of minutes should be considered in the present analysis of whether the Asociacion is Wetterer's alter ego, because the Asociacion maintained such a formality.

B. *The Texas Board of Directors.*

 The Asociacion contends that Judge Chrein incorrectly states at page 3 of his Report that "the Asociacion is a Guatemalan corporation with a Texas Board of Directors which the government claims fraudulently solicited donations in the United States using post office boxes in New York and Texas and deposited the funds into bank accounts in Florida and Texas."

In support of its contention, the Asociacion cites the testimony of Jeanne Perry ("Perry"), a member of the Texas Board and of the Asociacion's Advisory Board. She testified that the Asociacion formed the Texas Board in order to enable tax deductions for American donors to Mi Casa. (Tr. at 158). However, according to Perry, the Texas Board never actually functioned, because when the United States filed the criminal charges against Wetterer the Guatemalan Board of Directors decided to discontinue further proceedings in the United States. (Tr. at 158).

The Asociacion emphasizes that it is a Guatemalan corporation with a functioning Guatemalan Board of Directors, and that it is the Guatemalan Board which makes policy decisions, including financial and management decisions. To support its claim, the Asociacion cites to the testimony of several of its witnesses, who testified as to the existence of an operating Guatemalan Board of Directors separate from the Texas Board.

The Court finds that the Asociacion's contentions regarding the Texas Board are misplaced. The Court does not doubt that the

Asociacion has a functioning Guatemalan Board of Directors. In addition to the testimony at the hearing, the Asociacion's annual reports (Defendant's Exh. 7) reveal the existence of a functioning Board of Directors. Nor does the Court believe that Judge Chrein declined to find the existence of a Guatemalan Board of Directors. In the statement from the Report which the claimant objects to, however, Judge Chrein was referring to the Texas Board for purposes of conducting a choice of law analysis, and was restating the government's accusations. He did not make such a finding with regard to the existence of a Guatemalan Board of Directors.

It was perfectly proper for Judge Chrein to summarize the Government's position, and the Court does not find that he committed any legal or factual error by stating that the Asociacion has a Texas Board of Directors in the context of a choice of law analysis.

### C. Judge Chrein Failed to Conduct a Balance of the Applicable Passalacqua Factors.

The Asociacion contends that Judge Chrein erred as a matter of law in his consideration of the alter ego issue, because he focused on one of the indicia of domination set forth in *Passalacqua*, namely, whether the corporation's funds were used for Wetterer's personal benefit. According to the claimant, the ten factors set forth in *Passalacqua* constitute a balancing test that must be considered in the totality, and no one factor is determinative of alter ego status.

While the Court agrees with the Asociacion's contention that no one *Passalacqua* factor is determinative of alter ego status, the Court disagrees that Judge Chrein did not conduct an adequate analysis under *Passalacqua*. In order to make a finding of alter ego, the ultimate question for the trier of fact to determine is whether "considering the totality of the evidence, the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *Carte Blanche*, 2 F.3d at 26; *Passalacqua*, 933

F.2d at 139. *See also Jon–T Chemicals*, 768 F.2d at 692 ("[T]he alter ego question depends upon the totality of the facts.").

The Court believes that in reviewing the four transactions involving transfers of funds from the seized accounts, Judge Chrein did consider the totality of the evidence in this case to arrive at his conclusion regarding the alter ego question. The fact that he only focused on the first (lack of corporate formalities) and third (use of funds for personal, rather than corporate, purposes) *Passalacqua* factors in his Report does not imply that he ignored the other factors, or failed to consider any other evidence. Indeed, in the Court's view most of the remaining factors are inapplicable, because they concern the relationship of a parent to its subsidiary.

Accordingly, the Court finds that Judge Chrein's methodology in considering the alter ego issue under *Passalacqua* was not legally or factually incorrect.

### D. Transfer of $60,000 to Gary Wetterer.

The Asociacion contends that Judge Chrein erred in finding that the February, 1987 $60,000 transfer from account 05616, held in the name of the Asociacion, to Gary Wetterer for improvement of his waterfront property in Babylon, New York, was not a loan which was repaid by Gary Wetterer.

According to the Asociacion, Gary Wetterer repaid the loan in April, 1991, by allegedly providing three checks to the Asociacion totaling $78,686.87 (Defendants Exh. 5), thereby paying $18,686.87 in interest on the loan. In addition, the Asociacion contends that as part of the repayment, Wetterer donated the interest from $60,000 in certificates of deposits that were given by John Wetterer to the Asociacion to hold as collateral for the loan. Sapper testified that there was no need to record this transaction as a loan, because the certificate of deposits given as collateral provided documentation of the loan. (Tr. at 246–247).

Judge Chrein rejected these explanations that the transfer was a $60,000 "loan" and that it had been repaid. According to Judge Chrein, the only documentation to support this entire transaction were the three non-

negotiable checks totaling $78,686.87. Because the amount of these checks was in excess of $60,000, and because the transaction was neither evidenced by a promissory note nor recorded in the Asociacion's corporate minutes, Judge Chrein concluded that "this was not an arms length transaction and is the sort of transaction that support's the contention that the corporation was really Wetterer's alter ego." Report at 7.

Having reviewed the claimant's objections, the testimony at the hearing, and the evidence, this Court affirms and adopts Judge Chrein's finding. The testimony of Mr. Sapper is unclear as to whether these three checks are the proceeds of certificates of deposit transferred by John Wetterer to the Asociacion as collateral for the alleged $60,000 "loan", or whether they represent repayment of the loan by Gary or John Wetterer. (Compare Tr. at 221–222 with Tr. at 246). No loan documents or promissory notes were made or exchanged. Moreover, although other transactions were recorded in the Asociacion's minute books evidencing new construction or donations of vehicles (Tr. at 249–251), this transaction, as well as the other financial transactions, was not recorded. In the Court's view, even if the Asociacion's explanation is accepted, the structure of the transaction is entirely irregular.

The Court, therefore, agrees with Judge Chrein that the transaction supports the contention that Asociacion funds were being used personally by Wetterer, and that in this situation the Asociacion acted as Wetterer's alter ego.

E. *Tuition Payments to the Knox School.*

 As recited earlier, in August of 1987, 1988 and 1989, the Asociacion issued three checks totaling $17,070 to the Knox School in New York City from its Bank of America Account number 05616, for payment of John Wetterer's adopted son's tuition at the school. Wetterer's son, also named Gary, had lived at Mi Casa since age three.

The Asociacion contends that Judge Chrein's finding that these payments to the Knox school, in the absence of any salary paid to Wetterer, were "persuasive evidence" of the Asociacion's alter ego status, is erroneous. The Asociacion continues to maintain that these payments were authorized by the Asociacion's board of directors, and that they were provided for Wetterer's adopted son because (i) Wetterer did not receive a salary, and (ii) similar paid schooling abroad were provided to other boys at Mi Casa. According to Sapper, since 1984 the Asociacion provided tuition for approximately 30 to 50 boys it sent to the United States for schooling. (Tr. at 230).

The Government maintains that the Asociacion did not document similar disbursements it claims to have made for the education of other boys it sent to be schooled in the United States, and that the Asociacion's decision to pay for Gary Wetterer's school is not reflected in its corporate minutes. This Court notes, however, that the Government failed to cross-examine Sapper about these matters.

In the Court's view, in the absence of similar tuition payments for other boys sent to school abroad, the payment of Wetterer's son's tuition would be further evidence of the personal use of Asociacion funds by Wetterer. The Court believes this is the case whether or not Wetterer received a salary from the Asociacion. However, during its cross-examination of Sapper, the Government chose not to contest his statements that similar tuition disbursements were made for other boys, and limited its questioning only to whether the Asociacion recorded the Knox School tuition payments. (*See* Tr. at 274–275). If such payments were made for other boys, then on the evidence before this Court, the payment of Wetterer's son's tuition would not constitute personal use of the Asociacion's funds by Wetterer. Accordingly, because the Government did not pursue the issue, and notwithstanding the Asociacion's failure to record in its minutes any of the payments to the Knox School and their corresponding approval by its board of directors, the Court agrees with the claimant's objections on this issue.

The Court, therefore, does not adopt Judge Chrein's finding that the tuition payments to the Knox School support the Government's contention that the Asociacion is Wetterer's alter ego, in the face of uncontest-

ed testimony that similar tuition payments were made for other boys attending schools in the United States.

### F. *The May 9, 1989 Transfer of $30,000.*

The Asociacion contends that Judge Chrein erred in concluding that the May 9, 1989 transfer of $30,000 from the Asociacion's Bank of America Account number 5616 to a Certificate of Deposit in Wetterer's name held at the Sterling Bank, C.D. No. 15590, was a commingling of funds between the Asociacion and Wetterer which "strongly suggests" that the corporate funds were personally used by Wetterer.

According to the Asociacion, the reason it transferred the $30,000 was to prevent its Bank of America account from exceeding the $100,000 FDIC limit. The Asociacion claims that the account in Wetterer's name was established for "insurance/protection reasons." Claimant's Objections at ¶ 32.

Upon reviewing the evidence, the Court is not persuaded by the Asociacion's contentions and finds that Judge Chrein was correct in his conclusion that the transfer was a commingling of funds between the Asociacion and Wetterer which supports the contention that Wetterer personally used the corporate funds. The evidence is undisputed that from June 1989 until September 1990, the Asociacion's Sterling Bank account number 907–103 contained funds in excess of the $100,000 FDIC limit, and that the Asociacion did not take steps to transfer funds out of this account in order to stay within the $100,000 insurance limit. Moreover, during the same time, the balance maintained in Bank of America account number 5616 was well below the $100,000 insurance limit.

Accordingly, the Court adopts Judge Chrein's conclusion regarding this May 9, 1989 transaction.

### G. *Payments to Jeffrey Waller, Esq.*

Finally, the Asociacion contends that Judge Chrein also erred in concluding that the two payments made by the Asociacion to Jeffrey Waller, Esq. ("Waller"), one from its Bank of America account number 5616 in the amount $10,000 and the other from its Sterling Bank account number 907–103 in the amount of $15,000, is additional evidence that

Wetterer personally used the Asociacion's funds.

During his testimony, Sapper testified that the $10,000 payment to Waller was for his fee and trip to Guatemala in connection with advising the Asociacion whether it should sue CBS for the Sixty Minutes program which aired the allegations of sexual abuse by Wetterer. (Tr. at 239–240). Sapper also testified that the second payment for $15,000 was rendered to Waller in connection with Wetterer's arrest warrant and the Asociacion's need to investigate the matter, since Wetterer was a member of the Asociacion's board of directors at the time. (Tr. at 241). Part of this payment also went towards reopening a postal box. (Tr. at 241–42). Postal Inspector McDermott testified that Waller represented to him that Wetterer was his client, and that Waller inquired into the nature of the arrest warrant and indictment. (Tr. at 80).

The Court agrees with Judge Chrein that the $15,000 payment to Waller in connection with Wetterer's indictment and arrest warrant is suggestive of the fact that Wetterer personally used the Asociacion's funds. Wetterer personally benefitted from Waller's representation. Accordingly, the Court adopts Judge Chrein's conclusion with respect to the $15,000 payment made to Waller.

### 5. The Asociacion's Alter Ego Status.

The Court finds that the Asociacion's transfer of $60,000 from its bank account to Wetterer's brother in February, 1987, its May, 1989 transfer of $30,000 to a certificate of deposit in Wetterer's name, and its payment of $15,000 to Waller in connection with Wetterer's arrest, all constitute strong evidence that Wetterer used the Asociacion's funds for his personal purposes.

With regard to ascertaining the alter ego status of the Asociacion under the *Passalacqua* factors, the Court finds that in this case: the Asociacion failed to maintain corporate records, minutes and other formalities with respect to its financial transactions involving Wetterer (factor number 1); Asociacion funds were put in and taken out by Wetterer for personal rather than corporate purposes

(factor number 3); and that with respect to the Asociacion bank accounts at issue, Wetterer used the accounts as if they were his own (factor number 10). In addition the Court finds that, with regard to the transactions among its foreign bank accounts, the evidence shows that the Asociacion did not retain much discretion, but rather left matters to Wetterer and followed his advice (factor number 6). *See* Tr. at 224 (following Wetterer's advice with respect to establishing the $30,000 certificate of deposit at Sterling Bank), and 226 ("[W]e have complete confidence in the way John has handled financial matters in the last decade, so we … didn't ask for legal representation."). After reviewing the totality of the evidence and circumstances, the Court finds that the Asociacion acted as Wetterer's alter ego with regard to the financial transactions involving the Asociacion's bank accounts at Bank of America and the Sterling Bank. The Court's conclusion is based on its consideration of the *Passalacqua* factors as well as the alter ego criteria established under Texas law in *W. Horizontal Drilling*. Fundamentally, the Court's conclusion rests on its determination that in this case the policy behind the presumption of corporate independence and limited liability is not outweighed by the policy justifying disregarding the corporate form. *Carte Blanche*, 2 F.3d at 26. In the Court's view, the need to protect those who deal with the Asociacion, namely the donors sending money based on Wetterer's solicitation letters, outweighs the business interests of the Asociacion and justifies piercing its veil.

For the reasons stated above, the Court agrees with Judge Chrein that the Asociacion is Wetterer's alter ego.

### 6. Disentitlement to Raise a Claim.

 Having determined that the Asociacion was Wetterer's alter ego, the Court must now exercise its discretion and determine whether or not the Asociacion is disentitled from pursuing its claims because of Wetterer's alter ego status.

As mentioned earlier, the Court believes that the fundamental consideration in determining whether to exercise its discretion and apply the disentitlement doctrine to a corporate claimant is the extent of control over the corporation exercised by the fugitive, or, put another way, the extent of independent dominion and control the corporation has over its own assets. *Bravo*, 10 F.3d at 83–84; *Merrill Lynch*, 801 F.Supp. at 999; *Contents of Accounts Nos. 3034504504*, 971 F.2d at 985–86 & n. 9.

In this case, "credible evidence" was presented by the Government that the Asociacion's financial transactions were controlled by Wetterer, and that Wetterer used the Asociacion's bank accounts to further his own ends. Although the Court recognizes that the Asociacion presented some evidence of independent control over its finances, *see* Tr. at 216 (discussing the board of directors disagreeing with Wetterer on purchasing a truck), the Court believes that, overall, Wetterer significantly controlled the Asociacion's bank accounts and directed the transactions involving these accounts.

In addition, some of the other criteria set forth by Judge Weinstein for a court to consider when deciding whether a corporation is disentitled from pursuing its claim are implicated in this case. Unlike the situation in *Merrill Lynch*, here Wetterer can receive the benefit of the proceeds returned to the Asociacion, since, according to Sapper, he remains President of the Asociacion's board of directors. Moreover, although there is no evidence that Wetterer is deliberately flouting the judicial system in this forfeiture case, the Court notes the obvious fact that Wetterer has not only not cooperated with the Government's investigation in any of these proceedings, but he apparently is acting to forestall all investigation of the allegations against him by remaining a fugitive. Finally, the Court notes that the present civil forfeiture is not independent of the criminal case pending against Wetterer, but is based on the same underlying crimes brought against Wetterer by the Government. *See Merrill Lynch*, 801 F.Supp. at 999.

For the reasons stated above, the Court will exercise its discretion and hold that the Asociacion is disentitled from pursuing its claim in this proceeding, because of the control over the seized bank accounts and the Asociacion's banking transactions exercised

by Wetterer, who remains a fugitive. Accordingly, as modified herein the recommendation of Judge Chrein to strike the claim of the Asociacion is adopted, and the Asociacion's claim is stricken.

**SO ORDERED.**