UNITED STATES of America, Plaintiff,

v.

FUNDS HELD IN THE NAME OR FOR THE BENEFIT OF John Hugh WETTERER, and/or Asociacion Amigos Del Los Ninos Hogar Mi Casa, a/k/a Mi Casa, at Bank International and Sterling Bank, including but not limited to Bank of America Account Numbers IF 1119–9984, 162232 IBF, 10201–01–1, and B–58–05616, Lloyds Bank International Bank Number 00070891 (Nassau Branch) and Sterling Bank Account Numbers 907–103 and CD 15590 and all related accounts and funds, Defendants.

No. CV 91–0234(ADS).

United States District Court, E.D. New York.

Sept. 30, 1998.

162

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, New York by Susan L. Riley, Arthur P. Hui, Assistant U.S. Attorneys, for plaintiff.

June Resnick German, Stanley L. Shapiro, Huntington, New York, for defendants and claimants.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This may be the final chapter—at least at the trial level—of the continuing Wetterer saga, which has gone on for almost ten years and traversed two continents.

It is a disturbing tale. In the 1970's, Wetterer, a United States citizen and veteran of the Vietnam War, settled—permanently,

as it turned out—in Guatemala, where he founded an orphanage for homeless boys called "Mi Casa." From then to the present, Wetterer has been Mi Casa's director, organizer and policy-maker. In this capacity, Wetterer mailed newsletters to potential donors in the United States and abroad in an effort to raise funds for the Mi Casa orphanage. These newsletters painted a glowing portrait of Mi Casa as a wholesome, safe and secure environment for the boys in Wetterer's care. In reality, however, Wetterer physically abused and humiliated many of these boys by ordering them to strip naked in front of their peers and striking them on their bare buttocks with a paddle. Wetterer's "favorites" among these homeless children fared even worse: he sexually molested them.

When the United States was frustrated in its efforts to extradite Wetterer for the crime of mail fraud stemming from his fund-raising efforts, the Government initiated this civil forfeiture action against his American bank accounts. This opinion embodies the Court's findings of fact and conclusions of law after a non-jury trial.

## I. BACKGROUND

John Hugh Wetterer, a former Long Island resident, is a Vietnam War veteran who founded an orphanage in Guatemala City in 1976 called Mi Casa. Wetterer was assisted in financing the operation of the orphanage by the American Friends of Children ("AFC"), an organization he and several others founded on Long Island to raise money to serve the needs of children.

From 1976, when Wetterer opened Mi Casa, to 1988, AFC's treasurer, Daniel Mackey, sent Wetterer over one million dollars in donations to assist him in housing, clothing, feeding and educating the boys of Mi Casa. Mackey received these donations by mail at a Post Office box he set up and maintained for that express purpose in Massapequa, New York. He deposited the donations in the Chase Manhattan Bank of New York, and then, pursuant to Wetterer's instructions, made out checks payable to "John Wetterer" that were forwarded to Bank of America

account no. 05616 in Miami, Florida. Wetterer made arrangements to transfer the money from Miami to Guatemala. Although the Bank of America account was maintained in the name of Mi Casa, Wetterer was the sole signatory on the account.

Wetterer sent newsletters about Mi Casa to his supporters in the United States and elsewhere, including France. These newsletters portrayed Mi Casa as a normal, well-run orphanage, where abandoned, impoverished and neglected boys were given a chance for a better life by receiving shelter, clothing, food, medical care and education. Included in these newsletters were envelopes for supporters to send donations to the Post Office box Dan Mackey maintained. Mackey received donations to Mi Casa in these envelopes as a result of the newsletters. In the newsletters, Wetter openly discussed the use of the mails to send financial or other support, repeatedly thanked donors for the financial support he received from them, and from time to time, mentioned the need for financial support.

In late 1987, one of the boys who lived at Mi Casa, Manuel Bravo, revealed to his American sponsor, Mary Tyre, that Wetterer had sexually molested him. A similar revelation was made several months later by another boy from Mi Casa, Leonel Piedrasanta, who also was staying with Mary Tyre, Mary Tyre, in turn, contacted the television news program Sixty Minutes, which, in the Fall of 1988, was preparing to air a complimentary segment on Mi Casa and the work of John Wetterer. Sixty Minutes hired its own expert, Dr. Simon Miranda, to evaluate these claims of sexual abuse. In late November 1988, Sixty Minutes journalist Diane Sawyer confronted Wetterer with the allegations of sexual abuse. Shortly thereafter, AFC stopped depositing donations in the Bank of America account and ended its financial support of Mi Casa. Wetterer then arranged to receive donations for Mi Casa through a Post Office box in Spring, Texas.

On February 19, 1989, Sixty Minutes aired its segment on Mi Casa, including Sawyer's interview with Wetterer and the allegations of sexual abuse. Wetterer denied the allegations of sexual abuse orally and in his news-

letters. According to Mi Casa's records introduced into evidence as Def.Ex. W, during the period from January 4, 1989 through November 12, 1990, a total of approximately $1,111,073.69 in donations were sent to Wetterer and Mi Casa.

On September 14, 1990, a criminal complaint charging Wetterer with, among other crimes, mail fraud, was filed in the Eastern District of New York. On the same date, a warrant was issued for Wetterer's arrest. Wetterer was accused of knowingly devising a scheme or artifice to obtain money or property by false pretenses and representations and in using the U.S. mails to execute his scheme, in violation of 18 U.S.C. § 1341. On February 12, 1991, Wetter was indicted and charged with mail fraud and a related crime.

On January 22, 1991, the United States commenced this civil action, seeking the forfeiture of certain bank accounts held in the name of the Asociacion or Wetterer pursuant to 18 U.S.C. § 981. The *in rem* complaint listed as the alleged crimes underlying the basis for the seizure mail fraud, 18 U.S.C. 1341, and inducing a person to travel in interstate or foreign commerce for the purpose of engaging in criminal sexual activity, 18 U.S.C. § 2422. An arrest warrant *in rem* authorizing the seizure of the bank accounts was issued that same day.

On February 6, 1991, the Asociacion that allegedly operates Mi Casa filed a claim to the defendant funds, stating that these funds were deposited for the use and benefit of the Asociacion. On September 19, 1995, this Court found that the Asociacion is the alter ego of Wetterer and struck its claim. *United States v. Funds Held in the Name or for Benefit of John Hugh Wetterer*, 899 F.Supp. 1013 (E.D.N.Y.1995).

This case was tried by the Court beginning on February 19, 1997 and concluding on February 6, 1998.

## II. *THE FORFEITURE COMPLAINT*

On January 22, 1991, the Government commenced this civil forfeiture action pursuant to 18 U.S.C. § 981, and seized the funds on deposit in Bank of America account number 05616 in the name of Mi Casa; Sterling Bank

account number 907–103 in the name of Mi Casa; and Sterling Bank account CD 15590 in the name of John Wetterer. As of February 1997, the aggregate amount of money in these accounts is, according to the Government, the sum of $109,327.22.

The complaint alleges that these accounts were utilized in or constitute the proceeds of violations of federal law. It is alleged that Wetterer, the operator of an orphanage in Guatemala, "regularly and systematically molests and sexually abuses the minor boys who reside there." The complaint further alleges that Wetterer finances the operation of the orphanage, known as "Mi Casa," through contributions solicited throughout the United States and that "These solicitations are false and fraudulent insofar as Wetterer represents that 'Mi Casa' provides a healthy and stable environment for its residents, when, in fact, he molests and sexually abuses the boys who reside there." In sum, the complaint supports the forfeiture claim by the crime of money laundering—namely, engaging in financial transactions involving funds obtained by false mailed solicitations.

### III. *PRIOR PROCEEDINGS*

At the time this action was commenced, an arrest warrant in rem authorizing the seizure of the bank accounts was issued. In response to the seizure, the Asociacion filed a claim to all funds seized. All of the seized accounts are in the name of the Asociacion except the Sterling Bank account number CD 15590, which is in Wetterer's name. The Asociacion contends that it is the owner and entitled to the money in the Wetterer account.

In response to the Asociacion's claims, the Government filed a motion to strike the claims on the ground of lack of standing. The Government also contended that the Asociacion could not file a claim for funds held in Wetterer's name because he was a fugitive and was disentitled to contest any matter in the forfeiture case. The Asociacion countered that it had standing because it was a legal entity separate from Wetterer, and that his acts could not be attributed to the Asociacion. In response, the Government then contended that the Asociacion was

Wetterer's alter ego and a shell entity which he completely dominated and controlled in order to perpetuate his fraudulent scheme. Thus, the Government reasoned, since the Asociacion was Wetterer's alter ego, it was also disentitled to file a claim because of Wetterer's fugitive status.

The issue of whether the Asociacion was the alter ego of Wetterer, and thus barred from pursuing this claim was referred to Chief United States Magistrate Judge A. Simon Chrein, for an evidentiary hearing. After a hearing, Judge Chrein held that the Asociacion is the alter ego of Wetterer and recommended that its claim be stricken. In a decision rendered on September 18, 1995, in *United States v. Funds Held in Name or for Benefit of John Hugh Wetterer,* 899 F.Supp. 1013 (E.D.N.Y.1995), this Court essentially affirmed Judge Chrein's conclusions that the Asociacion is Wetterer's alter ego and held "that the Asociacion is disentitled from pursuing its claim in this proceeding, because of the control over the seized bank accounts and the Asociacion's banking transactions exercised by Wetterer, who remains a fugitive. Accordingly, as modified herein the recommendation of Judge Chrein to strike the claim of the Asociacion is adopted, and the Asociacion's claim is stricken."

However, in *Degen v. United States,* 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), the Supreme Court disapproved of the sanction of disentitlement as an "excessive response." *Id.* at 829, 116 S.Ct. at 1783. Accordingly, based on *Degen,* this Court's decision applying the disentitlement decision to strike the Asociacion's claim is vacated. However, the Court's decision that the Asociacion is the alter ego of Wetterer stands. The Court then proceeded to determine the validity of the Asociacion's claims on the merits. The issues in the case are: (1) Did sexual or physical abuse occur at Mi Casa?; (2) If so, as a result of such sexual abuse by Wetterer, did such conduct, coupled with the newsletters soliciting funds, constitute mail fraud?; (3) Did the Government fulfill the requirements under the forfeiture laws so as to permit seizure of the accounts at issue?; (4) Was the Asociacion the "innocent owner" of the funds?; (5) Was there a sufficient

nexus between the alleged mail fraud and the subject bank accounts?; and (6) Would forfeiture of the accounts at issue constitute an excessive fine? The claimants deny that any sexual abuse took place; deny that there was probable cause that Wetterer committed mail fraud; and seek to have the seized funds released to them.

## IV. *THE TRIAL—FINDINGS OF FACT*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and 65(d). *See Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange L.P. v. Continental Cas. Co.*, 923 F.2d 257 (2d Cir.1991).

Mary Tyre is a resident of and a businesswoman in Miami, Florida. She is familiar with Mi Casa having visited there until November 1988. Tyre sponsored children at Mi Casa. She received a monthly newsletter from Mi Casa with a return envelope addressed to the American Friends of Children. In response to the mailings, at times she sent money and clothes to the AFC and at times directly to Guatemala. Being in the children's clothing business, she sent and delivered clothes free of charge to the boys at Mi Casa.

During this period Tyre developed a mother/son relationship with Manuel Bravo, one of the boys at Mi Casa. With permission of Wetterer, Bravo spent time with Tyre in Miami Beach in 1986 and 1987. During the visit in December 1987, Manuel told her that "Uncle John" [1] watched the boys when they were in the shower and fondled and caressed them. In subsequent conversations Manuel told her that "Uncle John would invite them into his apartment for a meal and then a shower and then ... took him to bed ... [for] fondling, masturbation" (Tr. at 24).[2] Manuel made Tyre promise that she would not tell anyone about what occurred to him, because he didn't want to cause any problem for Uncle John.

In 1987, another resident of Mi Casa, Leonel Piedrasanta, visited and stayed with Tyre. In 1988 Leonel asked her "What I thought of Uncle John's making love with the boys." (Tr. at 26.) Leonel then described "much of the same thing that Manuel has said to me." In November 1988, Tyre called the television program Sixty Minutes, which was preparing a complimentary program on Mi Casa. She asked them not to air their program until they talked to Manuel.

On cross-examination, Tyre testified that she visited Mi Casa 1985, 1986, 1987 and 1988 and it was her impression that the facilities were providing services to children that needed them. Based on that impression she sent clothing and financial donations to the facility. Also, Tyre was on the Mi Casa mailing list and none of the mailings requested money. However, Tyre sent cash to the facility through her friend Hanna Colombey, a flight attendant. In addition, Tyre testified that in her visits to Mi Casa she never saw any evidence of sexual abuse and it was her impression that "it was a very good place." At Mi Casa, no one ever told her about sexual abuse of the boys. She observed the children in classes and in recreational activities such as soccer, baseball and swimming. However, she never stayed overnight, at a time when Wetterer was the only adult present. During her visits, no one ever approached her to complain of anything at Mi Casa. Also, even after Manuel made these allegations, she allowed him to return to Mi Casa. The Court notes that Tyre had no personal knowledge of any sexual abuse and relied entirely on statements to her by Manuel and Leonel.

United States Postal Inspector John McDermott was a child pornography specialist. In 1989, he commenced an investigation of alleged child abuse at Mi Casa by Wetterer, after the Sixty Minutes program in February, 1988. Wetterer sent newsletters to contributors almost monthly between 1985 and the end of 1988. The newsletters were on the letterhead of "American Friends of Children, Inc." or "Mi Casa American Friends of Children, Inc.", both containing a Guatemalan address. The newsletters enclosed a small payment envelope. Also intro-

---

**1.** John Wetterer will be referred to as "Wetterer," "Tio Juan" and "Uncle John."

**2.** Tr. refers to the page of the Trial Transcript.

duced in evidence were a series of checks drawn on the account of American Friends of Children, Inc. to the order of John Wetterer and deposited by Wetterer in a Bank of America account in Miami, Florida in the name of the Asociacion. Wetterer received approximately $520,000 from the American Friends of Children from March 1986 through November 1988. The Court finds that Wetterer solicited funds by newsletters sent to patrons in the United States. The funds were received by the American Friends of Children, Inc. and then sent to Wetterer for his use at Mi Casa. Apparently, Wetterer was the only signatory on the Asociacion checking accounts.

McDermott testified that the American Friends of Children, Inc. was a loose knit organization of volunteers on Long Island that attempted to help Wetterer in the operation of Mi Casa. Wetterer was on the Board of American Friends of Children and Daniel Mackay, now deceased, was the treasurer.

After the public allegations of sexual abuse at Mi Casa, Wetterer continued to mail newsletters between 1989 and 1991. In the newsletters these allegations were discussed and refuted by Wetterer. People continued to contribute to Mi Casa notwithstanding the allegations of sexual abuse. These newsletters contained preprinted return envelopes addressed not to American Friends of Children but to a post office box in Spring, Texas.

McDermott made out a criminal complaint against Wetterer and, on September 14, 1990, a warrant was issued for his arrest. He called Wetterer in Guatemala on the telephone and asked him to surrender in the Eastern District of New York and was told "He was much too busy caring for 500 boys and he couldn't possibly leave." (Tr. at 89). On February 12, 1991, Wetterer was indicted and charged with mail fraud and the interstate transportation of funds stolen by fraud. To McDermott's knowledge, after the issuance of the criminal complaint, Wetterer has never personally appeared in the Eastern District of New York.

McDermott testified that the basis for the mail fraud is that Wetterer misrepresented Mi Casa as a safe and healthy environment at the time that sexual abuse was being perpetrated by him at Mi Casa. In addition, and not alleged in the complaint, Wetterer is presently charged with beating the children, which, according to McDermott, also would belie his representations of a healthy and safe environment at Mi Casa.

McDermott made no attempt to interview any boys in Guatemala. In the United States, he interviewed six former residents and two adult volunteers of Mi Casa, namely Mary Tyre and Hannah Colombey, and some contributors to Mi Casa. He also interviewed two medical professionals, Dr. Miranda and Dr. Samek, who told him they thought Wetterer was sexually abusing the boys under his care. McDermott also spoke to six boys; namely, Jose Luis Lutin, Leonel Piedrasanta, Manuel Bravo, Joel Salas, Jerry Gomez and "Robert" Morgan. Piedrasanta and Bravo apparently are still in the United States, having applied for asylum. McDermott did not speak to any teachers in Mi Casa, who are daytime employees, nor did he visit Mi Casa.

As to the newsletters which are a basis for the mail fraud charges, they came from Wetterer and were received in the United States in envelopes containing Guatemalan stamps. The return envelopes were addressed to a post office box in Massapequa. Mackay would gather the envelopes and deposit the checks in a bank account of the American Friends of Children and then the funds were forwarded to Wetterer. Wetterer was a signatory on the American Friends of Children account. As stated above, there was a Miami bank account bearing number 05616. McDermott believes the name on the account was Mi Casa and Wetterer was a signatory on the account. According to McDermott, substantial sums of money in the Miami account was paid to and for the benefit of Wetterer's sons and to Jeffrey Waller, Wetterer's attorney.

Questioned about the alleged misrepresentations in the newsletters, McDermott pointed to the following language:

| | |
|---|---|
| May 1985 Newsletter | "They were also very happy." |
| July 1985 Newsletter | "Everything fine here. Same little boy activities." |
| August 1985 Newsletter | "So much has changed over three years; so many children have been helped." |
| May 1987 Newsletter | "Boys all OK." |
| October 1987 Newsletter | "All fine here." |
| June 12, 1988 Newsletter | "Everything is fine here ... So many people have this romantic picture of good old Tio Juan going from bed to bed tucking in each young fellow." |
| August 25, 1988 Newsletter | "Well, in closing a thank you for helping me during these past twelve years—a thank you for helping me to help so many young boys have a better future." |
| December 1988 Newsletter | "Been telling you to watch Sixty Minutes a number of times. Now sorry that I did—seems that, if the piece shows, it will be negative and very damaging. A false accusation is no less hurtful and I guess knowing that we had no 'skeletons in the closet'." |
| May 1989 Newsletter | "Pleased to say that each organization has arrived at the exact same conclusion *and found our home to be a safe, sane and stable place for the boys with absolutely no evidence, whatsoever, of child abuse.*" |

---

Pl.Ex. 2 (emphasis supplied).

The Court finds that the representation in these newsletters were intended to convey the impression that Mi Casa is a "safe, sane and stable" place for its boys. The Court further finds that such misrepresentations did induce contributors to send funds which eventually were received by Wetterer at Mi Casa.

The testimony of Dan Mackay was taken in a hearing before Chief Magistrate Judge Chrein on May 12, 1993. Mackay died prior to the trial and his testimony at the Chrein hearing was introduced in evidence. Mackay was Director of Security at the Breezy Point Cooperative and formerly was a member of the New York City Police Department. He and his wife first knew Wetterer in 1970 or 1971 in connection with his orphanage. They were interested in adopting a child themselves and visited the prior orphanage operated by Wetterer. They eventually formed an organization called the American Friends of Children. Their organization did fund-raising and also were "funneling checks." It had no other charitable activities other than Mi Casa.

The AFC sent checks to Wetterer from 1977 through 1988. The last one was sent on November 8, 1988. In all, the AFC raised and sent to Wetterer a total sum in excess of one million dollars. The checks were made payable to John Wetterer and deposited in his account in Miami in the Bank of America account number 05616. The procedure for raising money was that Wetterer sent to the sponsors a monthly update letter "saying how things were going and in that letter was an envelope which had American Friends of Children with our post office box in Massapequa so they can make their donations."

When the AFC found out about the allegations of sexual abuse they "froze the funds." The AFC decided to conduct an independent investigation and hired a psychologist, Dr. William Samek, to go to Guatemala. Mackay also went to Guatemala and interviewed Wet-

terer. At first Wetterer said he would not allow an investigation nor would he allow the children to be questioned. While at one point Wetterer agreed to permit Samek to do the investigation, after four hours, Wetterer told Samek to leave. Wetterer told Mackay that "he runs the orphanage [and] he would not allow anybody in there to conduct interviews." Wetterer also told Mackay that he "doesn't need any help from a gringo like myself in New York or anybody on the board" and "he doesn't need any influence from us up in the United States." The Samek report regarding the abortive investigation was not introduced in evidence at the Chrein Hearing.

There came a point when AFC decided to dissolve and cease all funding activities to Mi Casa. During this entire period Mackay was not aware that Wetterer was depositing the checks from AFC into a corporate account and he never heard the name Asociacion Los Amigo Del Los Ninos until 1988. In sending more than a million dollars to Wetterer, they believed in him and thought he was doing a good job in raising the boys of Guatemala. Significantly, Mackay testified that if, during the period of 1984 to 1988, he had any reason to believe that Wetterer was molesting children in Mi Casa, he would not have sent him any money.

At this point in the trial, the Government rested as to the three accounts seized by the Government on January 23, 1991, and held in interest-bearing accounts at the various banks. The charge of transportation for illegal sexual activities was withdrawn by the Government. The claimant moved to dismiss the forfeiture based on mail fraud on the grounds that (1) the Government failed to establish mail fraud in that the newsletters did not contain false or fraudulent misrepresentations, and (2) Mackay and AFC were not induced to make the financial contributions by any fraudulent misrepresentations by Wetterer, but rather because of their long relationship with Wetterer.

At the end of the Government's case, the Court made certain rulings. Bearing in mind that an indictment charging mail fraud was returned, the Government established that there was probable cause that Wetterer

committed mail fraud in the manner set forth in the indictment. The Court also ruled that the Government has shown a nexus between the seized bank accounts and the mail fraud, namely, that there was probable cause to believe that the seized funds represent proceeds traceable to the mail fraud. The Court reserved decision as to the wire fraud charges.

Once the Government established probable cause that mail fraud was committed by Wetterer and that there was a nexus between the criminal activity and the seized bank accounts, the burden of proof shifted to the claimants who had the obligation to prove, by a preponderance of the evidence, that either: (1) despite the presumption of probable cause, there was no sexual abuse at Mi Casa by Wetterer and the bank accounts at issue were not the proceeds of mail fraud, or (2) the claimants were "innocent owners."

### THE DEFENDANTS' CASE

Luz Estrada worked at Mi Casa from 1981 to 1991 as a secretary in charge of the office. She worked from 8:00 a.m. to 6:00 p.m. from Monday to Friday and a half day on Saturday. During the eleven years she worked at Mi Casa, no child or staff member ever told her of a problem of sexual abuse. No doctor ever wrote or advised her of a problem of sexual abuse. Estrada described the routine at Mi Casa with regard to meals, clothing, medical attention, education and sports. In her opinion, Mi Casa provided the boys with a safe, wholesome environment. This was especially important because some of the boys at Mi Casa came off the streets without food or a place to sleep. Of course, Estrada worked at Mi Casa during the day, and she conceded that she had no personal knowledge of what happened at night.

Dr. Phyllis Kaplan has a doctorate in clinical psychology and special education and is a member of the American Board of the Asociacion. She is coordinator in the Special Education Department at California State University. Kaplan worked with sexually abused children and has written books on the subject. She first met Wetterer in California in April 1975. Wetterer has been her friend and colleague for more than twenty years.

Wetterer was a soldier in Vietnam who was wounded twice. He helped to bring children from Vietnam to the United States. Kaplan had numerous contacts with Wetterer during this period. When Wetterer went to Guatemala to set up an orphanage, she assisted him by sending educational equipment. Kaplan also went to Guatemala once a year. She sponsored one of the boys at Mi Casa by sending money for his support on a monthly basis. Kaplan herself has ten adopted children. Kaplan contributes money to Mi Casa and receives the newsletters. However, she testified that the contributions are not based on the newsletters. She has visited Mi Casa approximately 25 to 30 times, including visits of two to three weeks and longer. During her visits she spent time with the children who confided in her. She also spent many evenings at Mi Casa during which she slept there with her own children.

Kaplan testified that no children at Mi Casa exhibited symptoms of sexual abuse and she never saw any signs of physical abuse. No child ever indicated to her that he was a victim of sexual abuse, including adult former residents of Mi Casa. In March 1989, after the Sixty Minutes telecast, she went to Mi Casa to try to remove Wetterer, if the allegations were true. However, in her opinion, there was no sexual abuse at Mi Casa and it was a safe and wholesome environment. There were as many as 70 staff members at Mi Casa and no one told her of any sexual abuse. She saw volunteers, social workers and priests at Mi Casa. Kaplan saw displays of affection between Wetterer and the children such as holding hands crossing streets and hugging. She saw children in Wetterer's living area watching television, sometimes 50 at a time. She also saw some boys sleeping in his quarters.

According to Kaplan, sexually abused children keep the abuse a secret for a while but as the abuse goes on they find someone they can trust to tell. Based upon her experience in the field of sexual abuse of children and her personal observations at Mi Casa and after talking to the children and the staff, Kaplan found no evidence of sexual abuse at Mi Casa. According to Kaplan, Mi Casa is a

happy home and offers children a better chance for a better future.

On cross-examination, Kaplan stated that she is not a licensed clinical psychologist. She stated that Wetterer had a position of authority and trust at Mi Casa. Further, while Kaplan was aware of Miranda's adverse report as to sexual abuse, she made no effort to talk to him. Also, she talked to Leonel and Manuel but not about the alleged sexual abuse. Nor did she speak to Samek, who was charged by AFC to investigate this matter, although she tried to do so. Significantly, Kaplan testified that "some people" relied on the newsletters in sending their donations to Mi Casa. In this regard, the Court notes the defendants do not deny that "if a newsletter said there was sexual abuse of children at Mi Casa that it would prohibit or inhibit some people in making donations." (Tr. at 561).

Arne Sapper is a businessman in Guatemala City. He is the Vice President and a member of the Board of Directors of the Asociacion ("the Board"), whose duty is to oversee the policies of Mi Casa. The Asociacion is a non-profit association organized under the laws of Guatemala which was started in 1984. The finances of the Asociacion are controlled by the Guatemala Government. Mi Casa is the trade name of the Asociacion, so that Mi Casa and the Asociacion are the same.

Sapper visits Mi Casa regularly day and night and attends Board meetings there almost once a month. He has talked to staff members, teachers and the boys at Mi Casa. No boy said anything to him about sexual abuse, nor did he observe any sexual abuse or have the slightest suspicion of such conduct. The boys at Mi Casa appeared to him to be very normal, open and friendly. There was never a claim of sexual abuse, except the boys involved in this case. Sapper was aware that Wetterer sent newsletters to donors which he said did not contain false statements.

After he learned of the charges of sexual abuse, the Board initiated a number of investigations. In addition, official investigations were conducted by various Guatemalan agencies. Strangely, Sapper never wanted to

speak to the boys who charged the sexual abuse. During the time criminal charges were filed against him in Guatemala, from July 22, 1991 to December, 1992, Wetterer and his sons were barred from Mi Casa. As to the staffing at Mi Casa, there were about 19 teachers, a female cook and other kitchen and maintenance personnel, together with priests and volunteers. The boys at Mi Casa were regularly examined by pediatricians. In his view, the boys at Mi Casa were given a healthy environment and have a better chance in the future. As to donations, some people do so based on recommendations, prior to receiving a newsletter. Remarkably, after the allegations of sexual abuse were made public, Sapper stated that the donations increased, including French donors from Les Amis. Sapper stated that approximately $30,000 seized in the Miami account was entirely French money.

On cross-examination Sapper revealed that the Asociacion was involved in several questionable transactions involving Wetterer and his brother Gary. In addition, the Asociacion paid $5,000 or more for Wetterer's son to go to school in New York. Wetterer has a strange compensatory arrangement at Mi Casa. Apparently he receives no salary *per se*, but the Asociacion makes certain payments for him, his sons and his brother.

David Wetterer is an adopted son of Wetterer along with younger brother Gary and older brother Bill. He was adopted from an orphanage in Vietnam. David lived in Mi Casa with his brothers, in separate rooms next to Wetterer. He lived there during the period 1976 to 1986. His father never sexually abused him or any of the other boys. David testified that Mi Casa is a safe, wholesome and happy environment. However, David was recalled later in the trial and testified in a damaging manner with regard to Wetterer's physical abuse of the children.

Enrique Barillas came to Mi Casa in 1982 with his brother Benito. He was nine years of age and his brother was seven. Barillas has a close relationship with Wetterer. He testified that the boys at Mi Casa took group showers. Sometimes, Wetterer assisted boys in the showers with soap, shampoo and towels. At the trial, Barillas testified that he is 24 years old and still lives at Mi Casa. There are six to ten older boys like himself who still live at Mi Casa. He is studying law and is preparing for the bar examination. He knew all the boys who made accusations against Wetterer and they never talked to him about sexual abuse. Barillas was never sexually abused by Wetterer, nor, according to him, was anyone else. He was interviewed by Samek in 1989 and he told him there was no sexual abuse at Mi Casa.

Barillas testified that he was in Wetterer's quarters and in his bedroom. He has taken hot showers and slept on the floor of Wetterer's quarters. Sometimes boys fell asleep on the floor of Wetterer's bedroom and some spent the night in his quarters. Sometimes, Wetterer was the only adult who slept at Mi Casa.

Sergio Salas became a resident of Mi Casa in 1977 at the age of eleven and lived there six years, leaving in 1982 or 1983 at the age of seventeen. He testified that he never heard or knew of sexual abuse at Mi Casa. The Court could barely understand this argumentative witness, who refused to testify through an interpreter despite his poor command of English. The Court believes that Sergio Salas did not tell the truth as to certain issues and the Court declines to credit the testimony of this witness.

Joshua Salas was also a resident of Mi Casa. He does not recall the dates of his residency. Tio Juan was like his father and he does not understand why "they" are saying things about him. Salas told all who asked him that there was no sexual abuse at Mi Casa. Further, Leonel and Manuel never told him that they were sexually abused.

At this point the defendants rested.

### THE UNITED STATES REBUTTAL CASE

The Government produced Dr. Simon Miranda, a Florida licensed clinical psychologist who testified at the trial on a number of occasions. Miranda interviewed six of the Mi Casa boys and rendered opinions concerning whether he believed they were sexually abused. In a 29 page Memorandum Decision and Order dated January 2, 1998, familiarity

with which is presumed (991 F.Supp. 112), the Court granted the defendants' motion to strike Miranda's testimony regarding recantation, and the statements to him of Leonel Piedrasanta, Manuel Bravo, Rotilio Sanchez, Hugo Piedrasanta, Jose Luis Melendez and Jose Luis Lutin. Further, the Court granted the defendants' motion to strike the transcript and tape-recording of Miranda's interviews of Leonel Piedrasanta.

In any event, the Court was not impressed with the testimony of Miranda, who received fees of approximately $40,000 for his interviews, reports and time spent in court. Notwithstanding this enormous expenditure, his testimony was of limited value. However, the Court accepts a portion of the testimony of Miranda, namely, that after being sexually molested, the boys he interviewed felt humiliated and demeaned, and they suffered when relating the incidents.

The Government then produced the Mi Casa boys who, it contends, support their contention of sexual abuse at Mi Casa.

Manuel Bravo is 28 years old and has lived with Mary Tyre in Miami Beach for the past nine years. Bravo lived in Mi Casa from the age of eight in May 1977 and for the next 12 years. Other than Wetterer, no adults lived at Mi Casa. When Bravo was nine years of age something unusual occurred. Wetterer asked him and another boy called Jorge to go to his bedroom, where they slept in Wetterer's bed, one on each side of Wetterer. Nothing else unusual happened that night. A second incident occurred when Bravo was 12 or 13 years old. Wetterer invited him to have dinner in his kitchen and to watch a movie in his living room. After the movie, Wetterer asked him to take a shower and Wetterer came in with a towel and dried him. The 6'2" tall Wetterer led the 5'4" tall Bravo to his bedroom, where he lay naked in Wetterer's bed. Wetterer locked the front door. Bravo put his underwear on. Wetterer removed his clothes and got in bed with Bravo, who related what happened as follows:

Q And what happened after he got in the bed?
A He started touching my chest. And then he went on to touching my back, down to my buttocks.

Q And did anything else happen?
A Yes. He put me on top of his chest. We were chest to chest. And I was touching his chest. And then later on he moved me on his right. And I was on my back when he proceeded to touching my private part.

Q Did you touch any part of his body other then his chest?
A That's the only place I felt comfortable touching him.

Q Did you say anything to Uncle John while you were having this experience?
A We never said a word to each other.

Q After Uncle John touched you or I guess was finished touching you, what happened after that?
A I believe I slept there and stayed until the next morning.

Q When Uncle John touched you, were you physically aroused?
A Yes, there was a point I was.

Tr. at 890–91.

Bravo testified that he had no other sexual encounters with Wetterer. He doesn't remember what year or date or season this latter incident occurred. Bravo remained at Mi Casa after the latter incident and overlooked the sexual abuse because of the educational opportunities afforded to him. Bravo told no one about these encounters until he confided in Mary Tyre and asked her to keep it a secret. He later related these incidents to Miranda. Bravo testified that he was willing to tell Miranda "because he was a psychiatrist and I felt that I needed a way to get it out of my system and talking would help me out." (Tr. at 952). Currently, Bravo is in the United States on a work permit. He applied for political asylum, which was denied. Bravo was fearful of returning to Guatemala after appearing on Sixty Minutes.

Bravo conceded that he was having sexual experiences with other young men at Mi Casa. Also, he never saw Wetterer abuse any other boy. Oddly, Bravo told Miranda that "80 percent of the boys at Mi Casa are being abused." (Tr. at 944). The Court credits the testimony of Bravo; he is a believable witness.

Jose Luis Lutin lives and is employed in Miami. He is 26 years of age and was born in Guatemala. Lutin first lived at Mi Casa in 1982 at the age of nine. He previously had lived in poverty without food, clean clothes or any education. At Mi Casa he had food, clean clothes, medical and dental care and he started his schooling. The boys at Mi Casa slept in three large bedrooms in bunk beds with 75 to 100 boys in a room. Wetterer was the only adult who lived at Mi Casa. Lutin called Wetterer "Uncle John" and he came to love him. He gave Wetterer a card on his birthday in 1985 and 1986 in which he stated, among other comments, that he thought of Wetterer "as a father" and "I love you dad." (Pl.Ex.20).

On May 27, 1985, the day before Lutin's birthday, something unusual happened. Wetterer took him by his arm and asked him if he was hungry. When Lutin replied that he was, Wetterer led him by the hand to his apartment. Wetterer locked the door, fed Lutin and told him to take a shower. Wetterer dried him with a towel and gave him a bikini to wear. Wetterer then led Lutin to his bedroom, locked the door, undressed himself and got in bed with him. Lutin then related what occurred, crying as he testified:

Q And after he got back in the bed what happened?

A He—he start fondle me. He started touching me.

Q Where did he touch you?

A All over my body, in my private parts.

Q Were you still wearing the bikini that he had given you?

A Yes, I was.

Q And were you physically aroused by Mr. Wetterer's touching of your body?

A Yes.

Q And after you were physically aroused what happened?

A Then he started kissing me.

Q And where did he kiss you?

A He started kissing me on my legs. And then he went and he pulled my underwear off.

Q And what happened after that?

A He continued to touch me.

He turned me sideways on the bed and he start hugging me.

Q When you say he turned you sideways, were you facing John Wetterer?

A No. My back was given to him, and he was facing my back.

Q And was he still wearing anything?

A Yes. He was still wearing his underwear and his white T-shirt.

Q And so what happened after your back was to John Wetterer?

A He put himself behind me. And he started breathing very hard, like loud and fast.

Q Did Mr. Wetterer move against your body?

A Yes. He just—he just put himself very close to me, to my back. And then he—he took his private parts and put it—

THE COURT: Does the witness want to take a break?

Do you want to take a short recess?

THE WITNESS: No, that's okay.

THE COURT: All right. Go ahead.

A (Continued). He took his private part and he put in between my legs.

Q Did anything happen when he put his private parts between your legs?

A He started like going back and forth. He just keep going back and forth. And every time, he just continued to breathe faster on me.

Q Did you feel any physical sensation as a result of the physical movement against your body?

A What do you mean?

Q Did his private parts ever touch your buttocks?

A When he was moving back and forth he—his private parts just—he just—he put it in behind.

One of the time he was moving back and forth, he put his private part inside of me. And I just—it kind of hurt.

MS. RILEY: Your Honor, I think it might be best if we took a break.

THE COURT: All right.

We will take a five-minute recess.

**174**

Q Now, during this encounter with John Wetterer, did you ever touch his private parts?

A He put my hand on his private parts, and he took my hand and put it on his private parts, and he continued to touching my private parts as well.

. . . .

Q And when you touched his private parts, did Mr. Wetterer put your hand on top of his clothes or underneath his clothes?

A He put it underneath his underwear.

Q All right.

And what did Mr. Wetterer do with your hand once it was underneath his underwear?

A He was—he was trying to—when he took my hand he started moving it up and down, like he wanted me to masturbate him.

Q Did John Wetterer ejaculate that night?

A Yes, something came out.

Q Did it come out in your hand?

A Not everything. Part of it just spill on my hand.

Q And did you also ejaculate that night?

A Yes.

Q Did John Wetterer say anything to you during this encounter?

A No. He just—like I said, he just continued breathing hard and faster.

The next morning he just—he look at me and he say, I love you, son.

Q Was this your first sexual experience?

A Yes.

Q Did you sleep in John Wetterer's bedroom that night?

A Yes, I did.

Q And what happened in the morning when you woke up?

A About 5:00 o'clock in the morning he got up and he went outside his apartment. After some time he came back and he told me put your clothes on, and he sent me to my room.

Q Now, after you had this experience with John Wetterer, did you still call him Uncle John?

A Yes, I did.

Q Did you still love John Wetterer?

A Yes.

Q Did he still feel like a dad to you?

A Yes.

Tr. at 1008–14.

Lutin testified that he had two additional roughly similar sexual encounters with Wetterer. They occurred when Lutin was 12 years of age, during the years 1984 and 1985. The Court need not describe the sexual aspects of similar episodes that were one week apart. However, during the third encounter, Wetterer also physically abused a nude Lutin by hitting him with a wooden paddle:

Q Did you take all of your clothes off?

A Yes, everything, everything. My socks, everything.

Q And then what happened?

A He went and he—

Q When you say "he" are you referring to John Wetterer?

A Yes, I am.

John Wetterer went and he took this wooden paddle. And he put me on his lap, and start hitting me.

And I asked him what did I do wrong?

Q Did he answer you?

A No. The more I asked him what did I do wrong, the more upset he got.

Then I stopped asking.

Then after that he told me lay on the floor. And he grabbed my two hands and put it on the floor, and my two legs.

So I was like bending on my two knees and my hands.

Q And then what happened?

A And then he got the wooden paddle, and he start hitting me.

Q And on what part of the body, of your body, did he hit you?

A On my behind.

Q And then what happened?

A After that he told me, get up. So I got up.

And he took his leather black belt that he was wearing, and he started hitting me like this (indicating) with his belt.

Q Did he actually make contact with your body with the belt?

A Yes. Every time he swing the belt he hit me in various parts of my body.

Q And did John Wetterer ever tell you why you were being beaten that day?

A No.

After he finished hitting me with his belt, he unlocked the door and he said get out. So I left.

Q Did you put your clothes on?

A Yes.

Tr. at 1017–18.

Lutin also described the sexual contacts that some of the boys at Mi Casa had with each other and that he had with two other boys. In addition, Lutin told of a second beating of him and seven other boys at the hands of Wetterer on a New Years Eve:

And he told me take your clothes off. When he said take your clothes off, that included everything. And just stay with no clothes at all.

So I took it. I took it off.

And then he left. And then he came back with another child, and put him in another classroom right next to me. And he did that until seven of the classrooms were filled with one boy, one guy in each classroom.

Then he came back to me and he put my hands up like this (indicating) against the board, against the blackboard, and he started hitting me with a wooden paddle.

He hit me for, I don't know, about five, ten minutes. And then he left. And he went to the next classroom.

Q How do you know that?

A Because the sandals he was wearing made noise on the floor when he walked in the next classroom. And he started hitting the other guy that was—

MS. GERMAN: Objection, your Honor.

THE COURT: You could see him hitting anyone else?

THE WITNESS: From another guy in another classroom, yes.

THE COURT: You could see this?

THE WITNESS: Yes.

THE COURT: What did you see?

THE WITNESS: He started doing the same thing he was doing with me. The other guy had his hands up the same position I had it. And he started hitting him the same way that he hit me.

Q Did this boy have on any clothes?

. . . .

THE COURT: You are saying you could see into another classroom across the way?

THE WITNESS: Yes.

. . . .

Q The question was: Mr. Lutin, could you see if that boy had any clothes on?

A Yes, I could see.

Q Did this boy have any clothes on?

A No, he did not.

. . . .

Q Did you hear any sounds coming from the other classrooms that were on the second floor?

A Yes.

Q And what were the sounds you heard?

A Well, every time that like for instance Uncle John would come to hit me and then he would go to the next one. And then I could hear the next guy in the next classroom screaming. And I heard the sounds of the wooden paddle as well. So that's how I heard.

Q Now, were you in pain as a result of the beating that you received that day?

A Yes, I was very—my behind was very—I mean it hurt. Because I remember that for the next two days I couldn't sit when I went to class.

Q Did Uncle John say anything to you that day about why you were being beaten?

A He told me because I had come late when I asked him if I could go and visit my father for New Years Eve, and it was

instead of coming at 2:00 in the morning, come at 6:00.

Tr. at 1024–27.

Lutin left Mi Casa in 1987 at the age of fifteen. He later returned and left for good in late 1989. Lutin told no one about being sexually abused by Wetterer, nor was he ever interviewed by anyone from the Guatemala Government or the judicial system. In 1990, Lutin came to the United States where he met Inspector McDermott and told him about the sexual abuse. In Miami, he stayed with Tyre and Hanna Colombey and met with Miranda. While in the United States, Lutin graduated from high school and was convicted of a felony involving a deadly weapon, a box cutter. He pled "no contest" and received a non-custodial sentence. Lutin never applied for citizenship or for political asylum in the United States. His present immigration status is that he has a work permit.

The Court finds Jose Luis Lutin to be a believable witness and credits his testimony as to the sexual abuse and the beatings by Wetterer.

FBI Supervisory Special Agent Kenneth Lanning is an expert in the area of child sexual abuse and the victimization of children. Given a hypothetical question, Lanning testified that young male victims of sexual abuse by an adult male generally do not make disclosure because of a number of factors. The first factor is the perceived stigma of homosexuality. Second, is the fear of society condemnation. Third, young boys often depend on the perpetrator and do not want to get him in trouble. The fourth reason is fearfulness on the part of the boy victim. The Court previously commented on Lanning's testimony in its January 15, 1988 decision (991 F.Supp. at 123), as follows:

The Court concludes that under the circumstances present in this case, expert testimony explaining that young boys are particularly reluctant to reveal the abuse because they fear being stigmatized or condemned by society, fear the abuser, and may like and depend on the abuser, was relevant to explain why the victims initially may have been unwilling to report that Wetterer molested them. "Behavior of this type is not within the ordinary understanding of the [fact-finder] and testimony explaining this behavior assists the [Court] in determining what effect to give the [victims'] initial failure to [report the abuse].... This evidence provides a possible explanation for the [victims'] behavior that is consistent with [their] claims that [they were molested]. As such, it is relevant." *Taylor*, 75 N.Y.2d at 292, 552 N.E.2d at 138, 552 N.Y.S.2d at 890. The Court notes that such testimony is not being admitted for the purpose of proving that the sexual abuse occurred.

What he related were really common sense notions, which the Court itself takes into consideration. Shame and fear were certainly feelings generated in young boys who were sexually abused by their teacher and leader and the most important adult in their life.

Gabriel Orellana Rojas is a practicing attorney in Guatemala. He taught in law schools in Guatemala and Florida. Rojas was retained by the Government to represent the United States in the extradition case against Wetterer. He also was retained by the Government in this case as a legal expert on the procedures in criminal cases in Guatemala. In that regard, he explained the workings of the criminal justice system in Guatemala. Rojas reviewed the certified copy of the records of the criminal case in Guatemala against Wetterer. The status of the criminal case against Wetterer in Guatemala is that it is still pending and is in the investigative stage. There has been no trial on the merits—neither a conviction or an acquittal. Wetterer is in a "provisional" status which can be revoked by the Court if additional evidence is produced.

As to the extradition proceeding, it failed because mail fraud is not an extraditable crime in the treaty between Guatemala and the United States. Also, the alleged sexual crimes were committed in Guatemala so that the United States had no jurisdiction over those matters. Accordingly, the Guatemala Court determined not to extradite Wetterer to the United States.

Rojas reviewed the Guatemala criminal court record and summarized his findings. Three persons said they were victims of sexual abuse at Mi Casa: Hugo Saelluis, Edgar Ronald Barrios and Cesar Giovani Lara. Also, he read a list of persons who were not themselves victims but said that they had knowledge of sexual abuse at Mi Casa.

Carlos Toledo is a citizen of Guatemala and resides in Guatemala City. He holds a degree as a teacher of humanities and he is the National Director of the Our Rights Association in Guatemala. His responsibility is "to support and promote . . . the human rights of the children who live on the streets of Guatemala." Previously, Toledo was employed as Program Director at Casa Alianza, a Guatemala foundation dependent on the Covenant House in New York, whose mission is to protect and afford refuge to Guatemala City's 10,000 homeless children. Toledo received special training on the sexual abuse of children.

In 1992, Toledo and Karen Rodas prepared a report concerning the abuses that occurred at Mi Casa. This report was an unpaid personal initiative by Toledo. In this report, they documented the abuse to street children who lived at Mi Casa. He and Rodas interviewed 25 children who were former residents of Mi Casa, averaging three to four interviews per child. Each of the interviews lasted two to three hours. Interviews of 13 children are in the report. In this investigation, they used fictitious names for the children, for "their own safety."

The Toledo report was placed in evidence by the defendants as Def .Ex. AL, with the translation as Pl.Ex. 39. Significantly, of the 25 boys interviewed, only one told him that he was sexually abused by Wetterer. The report contained two interviews with children identified as "Adolfo N.," conducted on June 9, 1991, and "Hugo N." on June 29, 1991. This segment of the report is relevant as to the material issues in this case and will be set forth in detail in Part V of this decision (Documentary Evidence).

In addition, Toledo and Rodas interviewed Silesian priests who gave them information similar to the facts stated by the interviewed children. In fact, Wetterer admitted in front of the nuns "that he did punish the children physically." Toledo and Rodas determined that the program was not fulfilling its objectives because of these experiences. Their report was delivered to the Prosecutor for Juveniles in Guatemala, at which time Toledo was accompanied by six of the interviewed children, including Hugo Sael.

The Court finds that Carlos Toledo is a credible and persuasive witness.

Gustavo Adolfo Munoz, referred to in the Toledo/Rojas report as "Adolfo N.," testified at this trial when he was 23 years old. A Guatemala resident all his life, he never saw his parents and was taken by his aunt to Mi Casa when he was six years old. Munoz lived at Mi Casa for seven years and left at the age of 13. Corroborating the report's summary of his interview, Munoz related what happened when he broke the rules of Tio Juan:

Q And who would punish you?

A Tio Juan.

Q And how would you be punished when you broke the rules?

A He would call me to the office. I would be told to take off my clothing.

Q And what clothing would you be told to take off?

A All my clothing.

Q Everything?

A Yes.

Q And then what would happen?

A I would be hit on my rear end with a ping-pong paddle.

Q And would you ever be punished like this in front of other boys?

A Yes.

 . . . .

Q. And on the many occasions when you were punished when there were other boys present, what would the other boys be doing?

 . . . .

A They would be naked just like me and they would be beaten just like me.

178

Q Would you be beaten in front of each other?

A Yes.

THE COURT: On how many occasions did this happen where other boys were naked and beaten in front of you?

THE WITNESS: About three times.

Tr. at 1623–24.

Munoz testified that, in addition to being physically abused as detailed in the report, he was sexually abused by Wetterer, which was not placed in the report. No details as to sexual abuse were given by Munoz. At the trial, the Court does not credit this latter testimony as to sexual abuse.

Dr. William R. Samek is a licensed clinical psychologist and the Founder and Director of the Florida Sexual Abuse Program in Miami, Florida since 1981. He has a Ph.D. from the University of Miami and had an internship and residency as a clinical psychologist and in studying sexual abuse cases. In addition he has lectured and testified in the field of evaluating sexual abuse. He was qualified as an expert in evaluating sexual abuse and treating sexual abuse victims. The personnel in his program treat victims of sexual abuse and do assessments for the courts. Samek has personally treated 300 to 500 patients with the program handling between 2,000 and 3,000 cases.

On December 5, 1988, Samek was contacted by Daniel Mackay and the Board of Directors of the American Friends of Children. Samek was asked to conduct an investigation of sexual abuse at Mi Casa by Wetterer. On December 29, 1988 Samek went go Guatemala to conduct the Guatemala phase of the investigation. Prior to leaving, Samek reviewed written material; spoke to the Guatemalan Consulate in Miami, the Ethics Chair of the American Psychological Association, Miranda, Mary Tyre, Manuel Bravo and Leonel Piedrasanta. However, he reached no conclusions after this initial investigation.

Samek began a more thorough investigation of Mi Casa on December 21, 1988. He met or talked to approximately 25 boys but only conducted two or three interviews, with each interview lasting two to three hours. Interestingly, Samek attempted to conduct an interview of Wetterer at an apartment in Guatemala City. Wetterer immediately started to cross-examine Samek. Wetterer was very controlling and insisted that Samek answer his questions. Indeed, Samek could not get Wetterer to respond to any of his questions. In fact, the interview ended when Wetterer fired Samek, terminated his services and ended the investigation. When Samek questioned Wetterer's authority to discharge him and terminate the investigation, he responded that he was the President and did have the authority. Samek then asked permission to continue interviewing the boys for a few hours and Wetterer said, "No." Further, Wetterer said he would not comply with a judge's order stating that the investigation could continue under certain conditions, and he said he was going to completely end the investigation. Samek never returned to Mi Casa and left Guatemala on December 23, 1988.

Before Wetterer terminated him, Samek did interview three boys in various stages of privacy in Guatemala, and none verbally told him that they were sexually abused. Although Samek apparently was prepared to do so, the Court declined to permit Samek to give his opinion as to whether Wetterer sexually abused the boys at Mi Casa. On cross-examination, Samek conceded that he did not diagnose or provide therapy to any person who alleged he was sexually abused by Wetterer.

Angel Antonio Ortiz has lived on the street in Guatemala City for about five or six years. Ortiz never knew his father and his mother is dead. His sister placed him in Mi Casa when he was at an age prior to entering school. When he testified he was 22 years of age. Ortiz liked living at Mi Casa where he studied, played, met friends, had enough food to eat and had clean clothes. He stated that Tio Juan was in charge of Mi Casa and made all the rules.

While he was at Mi Casa, Ortiz admitted that he broke the rules. He did not like to study, fought with other children and stole food. For these transgressions, Wetterer punished Ortiz each time he broke the rules. Wetterer forced Ortiz to strip naked and hit him on his bare buttocks with a wooden

paddle. Ortiz saw Wetterer hit other naked boys with the wooden paddle. He described how Wetterer would line up the boys who broke the rules, tell them to take off all their clothes and hit them. Ortiz testified that he had a burning feeling following the paddling.

In addition to this physical abuse, Ortiz also was sexually abused. Ortiz described in detail his first sexual experience with Wetterer:

Q Do you remember the first time you spent the night in Tio Juan's bedroom?

. . . .

A Yes.

Q And can you tell us what happened that night?

A That night before everything, I bathed.

Q And where did you bathe?

A In Tio Juan's bathroom, in the shower.

Q Did you take a shower or did you take a bath?

A A shower.

Q And after you took a shower, what happened?

A I dried myself off, I got out and I went into Tio Juan's bedroom.

Q And where was Tio Juan?

A Tio Juan was laying down on his bed and he had a bathrobe on his bed.

Q And what did Tio Juan do with the bathrobe on his bed?

A He gave it to me as a gift.

. . . .

Q What did you do with the robe that Tio Juan gave you after you took your shower?

A I put it on and he told me to lay down on his bed and I did.

. . . .

Q What did you do when Tio Juan told you to lay down on the bed?

A I laid down.

Q And then what happened?

A I was watching, we were both watching cable, in other words, his TV. And he started rubbing me here (indicating).

Q On your right or your left arm?

A The right one.

Q And what happened after Tio Juan touched you on your right arm?

A He started touching me here and then he started touching my chest. And then he lowered his hand down to my penis and he started touching me.

Q And did Tio Juan touch your penis?

A Yes. Well, he was rubbing me and I got erected.

Q And after you got erected, what happened?

A I got the chills and I don't know how I turned. I turned and my back was towards him.

Q By "him," do you mean Tio Juan?

A Yes, Tio Juan.

Q And what happened after your back was to Tio Juan?

A He put my bathrobe up and he started to rub my legs and he was also rubbing my penis and he put his penis on my rear end.

Q And did you feel anything when Tio Juan put his penis on your rear end?

A Yes. I felt that he put—well, that he was trying to penetrate my anus.

Q And did you say anything to Tio Juan as he was trying to penetrate your anus?

A Yes. I told him it hurt me.

Q And did Tio Juan say anything to you when you told him it hurt you?

A Well, at about the fourth time I turned around and I told him that it hurt me.

Q And when you say "fourth time," what are you referring to?

A When he was penetrating my anus, about the fourth time it hurt me. I told him that it hurt me.

Q And did Tio Juan say anything to you when you told him it hurt?

A Yes. He told me "I'm sorry." He told me.

Q Did he tell that [to] you in Spanish or in English?

A In English.

Q What happened after Tio Juan tried to penetrate you?

A Well, he continued rubbing me and, well, I felt—well, I was feeling—I was feeling like sort of excited also. And he turned me around again and then he did not attempt to penetrate my anus. And I felt that he was masturbating himself and he was touching my penis.

Q And what happened after that?

A I felt that he was—that there was some liquid, that there was some liquid and that was almost at the end he pressed my penis very hard when he was towards the end.

Q And before this experience with Tio Juan, had you had any sexual experience?

A No, never, ever in my life.

Q What happened after Tio Juan pressed you and the liquid came out from him?

A Well, he finished and he told me to go and bathe again, so I went to bathe.

Q And when you say "bathe," did you take a bath or did you take a shower?

A I showered again.

Tr. at 1822–26.

Ortiz also testified that he had seven or eight other sexual encounters with Wetterer, including the following:

Q Now did you have any other sexual contact when you stayed with Tio Juan when you lived at Mi Casa?

A Yes, I did.

Q How much other contact did you have with him?

A I had about seven or eight encounters with him.

Q Is there any other encounter that stands out in your mind that you had with Tio Juan?

A Yes. When he got me to kiss his penis.

Q And do you remember which of the seven or eight other incidents that you refer to, which incident it was when he got you to kiss his penis?

A It was the third time that he got me to do that.

Q And what happened on that occasion? Would you tell us?

A Yes.

Q What happened?

A That time I looked at his penis and he put his penis in my mouth and he was masturbating himself.

Tr. at 1827.

Ortiz testified that all of these sexual contacts occurred in the same year. He did not tell his teachers about these occurrences nor did he try to leave Mi Casa, because he had no place to go. Ortiz did not even tell his brother because "I was ashamed for anyone to know that he had done that to me." However, he did give a statement about the sexual abuse to Carmella Curup of the Guatemala Human Rights and Gustavo Munoz was with him at the time.

After Wetterer was arrested, Ortiz visited him in a holding cell, demonstrated on his behalf at the United States Embassy and gave statements in his support. Ortiz told everyone that "he treated us well" because he wanted him back, and "I always loved him a lot" and because Wetterer provided a happy environment at Mi Casa. In fact, Ortiz testified that he still loves Wetterer today because he helped him and taught him English, but "what happened between him and me, I also carry that in my heart." (Tr. at 1852). Asked why he left Mi Casa, Ortiz stated that "Tio Juan got tired of me" and threw him out. However, although the testimony in this regard is unclear, Ortiz returned to Mi Casa and spent additional time there. Ortiz left Mi Casa for good when Wetterer told him to go because he was again starting to break all the rules, including stealing.

Ortiz admitted that he took drugs of all kinds, including glue, solvents, marijuana, cocaine and crack. In fact, he started "doing drugs" at Wetterer's house at Mi Casa. He has been using drugs for about six years. However, Ortiz was never convicted of any crime in Guatemala. Notwithstanding his derelictions, the Court believes the testimony of Ortiz as to the sexual encounters with and the beatings by John Wetterer.

The Government rested.

### THE CLAIMANT'S CASE

David Wetterer, a son of Wetterer, was recalled as a witness. He described the loca-

tion of his father's living quarters. During his years at Mi Casa, David slept in a room next to Wetterer's bedroom and could hear conversations through the walls. After he left Mi Casa in 1986, his brother Gary continued to live there. He and his brother used the bathroom next to his father's room. David described Wetterer's apartment in great detail supported by diagrams and a videotape.

Of importance, on cross-examination, David testified that while the videotape showed no boys in his father's bedroom, usually there are people in there at night. (Tr. at 2025). Also, the hallway on the first floor of his father's apartment is approximately 100 feet long and could be lined up with 50 to 75 boys. The door between his and his father's bedroom is hollow. From his bedroom David could not have heard his father fondling or having sex with a boy in his father's bedroom.

Corroborating his father's method of punishment, David testified that his father hit him with a paddle on his bare buttocks between one and five times. When his father struck him, it was "hard" and it hurt him. Also, while he was living at Mi Casa, David "probably" saw his father strike other boys with a wooden paddle on their bare buttocks. The wooden paddle is made of hard wood and is about one foot long,, four inches wide and one inch in thickness. David related that his father summoned boys to his office and he could hear when Wetterer struck them with the wooden paddle. However, according to David, those boys deserved to be hit.

Elizabeth Wetterer is the mother of Wetterer. She testified that Wetterer was circumcised. This testimony was designed to refute the testimony of Gustavo Munoz who stated that Wetterer was not circumcised. The Court has considered this evidence and, based on the totality of the circumstances involving witness Munoz, nevertheless credits his testimony as to his sexual abuse by Wetterer.

## V. DOCUMENTARY EVIDENCE

Government's Ex. 39 is a record from the Guatemala Government Attorney's Office, Juvenile Prosecution Division. It is the basic document resulting from the investigation of Wetterer. The report includes statements from many children regarding rampant physical abuse as well as sexual abuse involving Wetterer's "favorites." Some of the relevant entries in this record are as follows:

The Hogar Mi Casa has been operating in Guatemala since September 1976 and the only person in charge is given as Mr. John Wetterer, who is a veteran of the Vietnam War and who guided by his interest in children, decided to set up this program.

. . . .

Set out below are a series of testimonies that were requested so as to uncover the truth and thereby benefit the defenseless children.

Interview: Abraham N.
Date: June 21, 1991
Age: 17

When he was asked about the situation of Tio Juan since he lived in the Hogar Mi Casa for approximately three years, he stated that when Tio Juan hit him as a punishment he used a paddle and he had to take his clothes off.

He also stated that he knew about children who slept with Tio Juan and that there were special places, such as the green room, where he only went up to once, and he was undressed and they hit him.

Interview: Luis N.
Date: June 21, 1991
Age: 14

He lived in the Hogar Mi Casa for about three years, and his younger brothers are now there.

When asked if he knew about Tio Juan he said that he did know that he had his favorites, and said that Rodolfo "Chofo," Hugo's cousin, is one of Tio Juan's favorites.

He said that to hit them when they had done something wrong, he took their clothes off and hit them with a wooden paddle.

Interview: Francisco N.
Date: June 12, 1991
Age: 10

He lived in the Hogar Mi Casa in May 1991. The child assures that Tio Juan molested the following children: Chofo and the brother Julio and Jonathan. Julio is in preschool, Jonathan is in first grade and Chofo is in sixth grade. These three children are now living in the Hogar Mi Casa.

Interview: Hugo N.

Date: June 28, 1991

Age: 20

He lived at the Hogar Mi Casa for two years, roughly from 1990 and left the Home. He was a member of the marimba and travelled to the United States.

While he was living at the Hogar Mi Casa, he was able to witness the following: that Tio Juan took children to his room to sleep and that when they were watching television, Tio Juan used to hold hands with some of the children, including him, and put them into his pants and made them caress his penis. Later one night he noticed that after television activity, Tio Juan chose a child to go and sleep with him. At about eleven at night this child saw through a window that the child that Tio Juan had taken with him had his trousers down and Tio Juan was on top of him and penetrating him. He left the Hogar Mi Casa because of many of these abuses. He is now a street child and made his charge to the Human Rights Ombudsman, Family and Minors Branch, on June 28, 1991.

Interview: Adolfo N.

Date: June 9, 1991

Age: 17

He lived in the Hogar Mi Casa for seven years from the age of six, after which he was moved to the Albergue Juvenil.

When he was asked what was his opinion or if he knew anything about what was being said about Tio Juan molesting children, he stated that he had heard and knew some of the "favorites" who reported the crime.

He gave the following replies:

I don't want to say bad things about him, because he has helped me, but all I knew and realized was that some children slept with him and we made fun of them and they just said that they were going to tell Tio Juan. I don't know what he did to them but they just said that they slept with him.

I don't know if he was bad or not. What he did do was grope our arms, backs, heads while we were watching television and I was not one of the "favorites" because he even took them on trips and you could see that he had his preferred group.

He also stated that the way Tio Juan hit them as a punishment, telling all of them when he hit them to take off their clothes and before hitting them with the paddle on their buttocks, he slapped their buttocks with his hand for about fifteen seconds and then he hit us with the paddle.

The last time he hit me with the paddle was last year and also with a belt, undressed. He says that he felt bad when Tio Juan hit him undressed because it is not nice to be in the nude when one is big.

He mentioned Quique and Benito Barillas, Moncho (who lives there), Chivito and Pitufo (Carlos) who are no longer in the home, as being "favorites."

He spoke to Adolfo N. on a referral from Daniel N., who lived in the Albergue Juvenil for about eight years. He assures that Adolfo N. told a group of children some time ago that what was being said about Tio Juan was true.

. . . .

Interview: Manuel N.

Date: June 18, 1991

Age: 17

He says he lived in the Hogar Mi Casa for about four years. He says that Tio Juan hit them with a paddle, naked, and he was personally hit in this way several times.

He says that Tio Juan's favorites were the only boys who had access to special places in the physical area of the house. He did not personally notice any sexual abuse and was not the object of sexual abuse, but he says that some boys slept with Tio Juan.

Interview: Marvin N.

Date: June 18, 1991

Age: 13

He lived in the Hogar Mi Casa for about two years and says the (sic) he was hit by

Tio Juan in a punishment that was common for the boys at the Home, he undressed them and hit their buttocks with a paddle.

Interview: Wilson N.

Dated: July 3, 1991

Age: 14

He lived in the Hogar Mi Casa for about six months in 1990. He says that he knew that Chofo slept with Tio Juan and that he is one of the "favorites" and that is why they say he is Tio Juan's son.

He says that when Tio Juan hit them he used a paddle and he asked him to take off his pants and underpants.

He mentioned that only the "favorites" could go into the green room and that there is a television in that room and it is painted green. He said that he was only able to go into that room once, because only the boys who are most trusted by Tio Juan can enter it.

He says that there was a group of boys who washed Tio Juan's feet.

Interview: Givanny (sic) N.

Date: July 12, 1991

Age: 15

He lived at the Hogar Mi Casa from January to April 1991, and was then moved to the Albergue Juvenil, in April, and lived there for two months.

During the time he lived at the Hogar Mi Casa he says that the second day after arriving, Tio Juan called him into his office to get to know him better and touched his head and then took him to his room and started to ask him about somebody he knew, because he had known him since he had been in charge of music. Tio Juan also asked him if he was gay (homosexual) and he told him that he was not, but that some of his pupils were gay. These were Enrique and Benito Barillas.

Tio Juan started to grope him and touch his genitals in his room and he told Tio Juan that he should not make a mistake with him and told him not to touch him because he was not gay. He says that Tio Juan blushed and afterwards he treated him well and did not bring up what had happened, he let him have privileges and he could go into the green room. Shortly afterwards he was moved to the Albergue Juvenil because he hit "Tripa," one of Tio Juan's favorites.

Tio Juan's son, Gary Wetterer, solicited several of them to have relations in return for not telling Tio Juan about complaints about them and he touched their genital organs.

There is a green room in the Hogar Mi Casa where only the "favorites" can go. These were 10 boys (2 little boys: Whisky and Chofo, and 8 big boys: Quique, Benito, Nixon, Tomas, Cupa, Tripa and two more).

The boys who sleep in the green room are the boys who have relations with Tio Juan, they are always with him they can go anywhere in the Home, and even have access to the safe, and they eat with him.

To hit them he asks them to take their clothes off and hits them with a paddle and he saw Tio Juan hit a boy in the face and ask him to come back after bathing in underpants with him.

The teacher Marco Tulio and Isa from the Kitchen stayed sometimes at night.

He said that food, medicine, clothes and basic needs are lacking at both the Hogar Mi Casa and at the Albergue Juvenil.

Giovanny N. filed a charge of what had happened with the Juvenile Court in May 1991 and then he told the Director of the Albergue Juvenil about the charge he had made and this is one of the reasons why he had to leave the Albergue Juvenil.

Interview: Juan N.

Date: July 16, 1991

Age: 14

He lived in the Hogar Mi Casa for two years about six years ago.

He says that Tio Juan had his favorites and he touched them and sometimes he let them see pornographic movies. He also gave them new shoes, clothes and money.

The boys who slept with Tio Juan were moved to another room and at night he took them to his room and sometimes he saw that Tio Juan did with his favorites what homosexuals do as he masturbated them.

He was hit several times by Tio Juan with a paddle and had to take his pants and underpants off.

Interview: Carlos N.

Dated: January 1991

Age: 20

He lived in the Hogar Mi Casa for several years about eight years ago and once, in January, Tio Juan had sexually molested him and this was one of the reasons why he had decided to go and live in the streets. He is now 20 years old.

Attempts are being made to contact him again to interview him.

. . . .

Interview with Doctor Arturo Figueroa:

Doctor Figueroa, a Specialist in Oncology, Gynecology and Surgery, who works in the Rafael Ayau Home, states that about five years ago, a routine examination of a boy had just come to the Rafael Ayau Home from the Hogar Mi Casa gave the following results:

a) The anal inspection clearly showed that the boy had really been abused, because of the deformation of his anus.

b) The boy had a sexually transmitted disease in his anus.

c) The boy said he had sexual relations with Tio Juan. The boys was approximately 12 years old.

d) According to the boy, he was rejected and expelled from the Hogar Mi Casa by Tio Juan because he was ill.

e) The Doctor also stated that there is a medical record in the boy's file at the Rafael Ayau Home which recorded this fact.

. . . .

Conclusions

1. The boys' testimony and the interviews and reports submitted by professionals and adult, show numerous signs of a pattern of deviant sexual behavior on the part of Mr. John Wetterer.

2. According to the investigations, the boys have always been and continue to be manipulated, terrorized, threatened and controlled, and are unable to speak and tell the truth, lacking the safeguards they merit as children, and they are rather manipulated according to the self-interest of the adults around them.

3. The Juvenile Affairs Department has covered up actions brought against Mr. John Wetterer.

4. Due to the fact that Tio Juan stays alone at the Hogar Mi Casa during the night, there is every possibility that sexually motivated abuse is occurring, and this way, he is assured that there will be no other adult witnesses.

5. Most of the poor families that are supporting and protecting him are seeing the situation only in regard to the needs that he is covering and not with regard to what Tio Juan is actually doing.

6. The boys are being manipulated and misinformed to get them to work in favor of Tio Juan, so as to obtain from them all their support, by threatening them to keep them from giving out the whole truth.

7. Tio Juan has enjoyed the protection of certain authorities who are the same ones that have often blocked any serious and objective investigation of the case from being carried out.

8. It is very difficult to find any real proof of sexual abuse, since no forensic medical examinations have been performed on any of the children.

## VI. *ADDITIONAL FINDINGS OF FACT*

The Court finds that Wetterer was personally involved in many acts of sexual abuse with a number of boys at Mi Casa. On most evenings, Wetterer was the only adult present at Mi Casa. Usually, he was the only adult who slept at Mi Casa. Wetterer was in sole supervision and command, and he made the rules that governed the orphanage and the boys at Mi Casa. The Court further finds that among the boys who were sexually abused at Mi Casa were Manuel Bravo, Jose Luis Lutin, Angel Antonio Ortiz, Givanny (sic) N. and Carlos N.

The Court further finds that Wetterer physically abused many of the boys at Mi Casa by ordering them to undress and beat-

ing them on the buttocks with a wooden paddle.

In addition, the Court finds that Wetter solicited funds by way of newsletters that were mailed to potential contributors in the United States and abroad. The newsletters contained return envelopes for contributors to send in checks. In the newsletters Wetterer portrayed Mi Casa as a "safe, sane and stable" place and a normal, well-run orphanage for impoverished and abandoned boys. Further, after the allegations of sexual abuse became public, Wetterer expressly denied that he abused any of the boys at Mi Casa in his newsletters dated December 1988, March 1989, May 1989 and September 1990. (See Pl.Exs. 9, 44, 46).

Wetterer received substantial money, in excess of one million dollars, from donors who where induced to contribute by Wetterer's assurances of a safe and stable orphanage. With reasonable certainty, if the donors knew that Wetterer sexually abused some of the boys and beat their nude bodies regularly, they would not have made these contributions.

## VII. *THE GOVERNMENT'S MOTION TO AMEND*

■ During the trial, the Government made two motions to amend or to conform the pleadings to the proof. The first motion was to add allegations of wire fraud, which previously were not pleaded. (See Pl. Post–Trial Memorandum of Law p. 9, FN 7). The second motion is to amend the complaint to add a claim of physical abuse or to conform the pleadings to the proof. (See Pl. Post–Trial Memorandum of Law p. 12, FN 9).

■ Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." *See also Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995); *Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993). Nevertheless, leave to amend is not granted automatically or reflexively. The Supreme Court stated in *Foman,* its seminal amendment case, that denial of a Rule 15(a) motion may be appropriate in instances of "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of the amendment....* " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (emphasis added); *accord Zahra,* 48 F.3d at 685; *Block,* 988 F.2d at 350; *Ruffolo v. Oppenheimer & Company,* 987 F.2d 129, 131 (2d Cir.1993) (where granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend).

Applying the standards set forth in *Foman* and its progeny, the Court finds that the proposed amendment to the Complaint with regard to the wire fraud would be futile. The Court finds that there is insufficient proof of wire fraud and denies the motion to add this claim to the Complaint.

■ However, the Court grants the motion to add the claim of physical abuse in addition to the sexual abuse. The defendants had a full and fair opportunity to contest this claim; certainly knew about the claim in time to defend themselves; and there is no prejudice to the defendants. Accordingly, the plaintiff's motion to amend the Complaint to add the physical abuse claim is granted.

## VIII. *THE REQUEST FOR A MISSING WITNESS INFERENCE*

Wetterer did not testify or appear at this trial. The plaintiff requests a "missing witness" adverse inference with regard to Wetterer's absence. Initially, the Court notes that the statement in the plaintiff's Post–Trial Memorandum of Law at p. 18 that "This Court has already decided to take the adverse inference against Wetterer," is not entirely accurate. During the trial the Court merely stated that "it can take an inference from [the] missing Mr. Wetterer," thereby indicating that it would consider invoking the "missing witness" inference.

■ Despite the dilution of the "missing witness rule" in some Federal Courts (*see, e.g., Herbert v. Wal–Mart Stores, Inc.,* 911 F.2d 1044 (5th Cir.1990)), in this Court's view, the rule is still in force the Second

Circuit. *See, e.g., Felice v. Long Island railroad Co.,* 426 F.2d 192 (2d Cir.) *cert. den.* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *cf. Gray v. Great American Recreation Association, Inc.* 970 F.2d 1081 (2d Cir.1992).

■ Generally, there is no duty on the part of either party in a civil proceeding to call any particular person as a witness, nor may the failure to call a witness be the basis of a finding of fact on a point about which no evidence has been received. However, "[t]he non-appearance of a litigant at the trial or his failure to testify, as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention," *Gray v. Great American Recreation Association, Inc.,* 970 F.2d at 1082 (quoting from *United States v. Fields,* 102 F.2d 535, 537–538 (8th Cir.1939); 22 C.J. Section 57 p. 121).

■ In this case, Wetterer did not leave Guatemala and appear or testify at this trial for the obvious reason that he is a fugitive, under federal indictment. An element to consider in applying this adverse inference is whether the defendants offered no reasonable excuse for the failure to call Wetterer. The issue is presented as to whether a potential arrest on an indictment would be a reasonable excuse not to appear. On the totality of the peculiar circumstances in this case, the Court finds that the defendants have offered a reasonable excuse, and the Court declines to make an adverse inference based on Wetterer's absence.

■ The defendants request that the Court invoke the missing witness charge as to the absence of the witnesses Leonel Piedrasanta and Hannah Colombey. The Court declines to do so on the grounds that these witnesses are not under the control of the Government and are equally available to each party.

## IX. CONCLUSIONS

### A. Civil Forfeiture: The Standard

■ In order to seize property under 18 U.S.C. § 981, the Government must demonstrate that there was probable cause to believe that the property is subject to forfeiture. *Marine Midland Bank, N.A. v. United States,* 11 F.3d 1119, 1124 (2d Cir. 1993). In the context of the seizure of bank accounts allegedly forfeitable under § 981, "[p]robable cause is established if the Government can show that it has reasonable grounds, more than mere suspicion, to believe that the property is subject to forfeiture. The Government must be able to show a nexus between the illegal conduct and the seized property. The Government is not required to link a bank account to a particular illegal transaction, but it must have probable cause to connect the account to criminal activity." *Id.* at 1126 (citations omitted). In the final analysis, "[w]hether probable cause exists must be determined on the basis of the totality of the circumstances." *In re Seizure of All Funds in Accounts in the Names Registry Publishing, Inc.,* 68 F.3d 577, 580 (2d Cir.1995); *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987).

The Second Circuit has held that: "After the government has established probable cause, the burden shifts to the claimant to 'demonstrate by a preponderance of the evidence that the factual predicates necessary to show probable cause have not been met or to show claimant[']s lack of knowledge or consent....'" *United States v. Daccarett,* 6 F.3d 37, 57 (2d Cir.1993) *cert. den.* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994).

■ Stated otherwise, once the Government has made such a showing, the burden shifts to the claimant to show, by a preponderance of the evidence, that the defendant property was not in fact used unlawfully and hence is not subject to forfeiture. *See U.S. v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 487 (2d Cir.1995); *United States v. Daccarett,* 6 F.3d at 57; *United States v. 15 Black Ledge Drive,* 897 F.2d 97, 102 (2d Cir.1990); *United States v. 4492 South Livonia Road,* 889 F.2d 1258, 1267 (2d Cir.1989).

According to the Government, the bank accounts at issue are subject to forfeiture because they are linked to two discrete forms of criminal activity: mail fraud and money

laundering. The Court considers the elements of these crimes in turn, and determines whether the Government has established probable cause to believe that the bank accounts are connected to such criminal activity.

## B. Mail Fraud and Money Laundering

Title 18 U.S.C. § 981 provides, in relevant part, that any "property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 ... of this title [the federal money-laundering statute], or any property traceable to such property" is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). The Government contends that the defendant property had been used to facilitate violations of 18 U.S.C. § 1956, the money laundering statute. In pertinent part, 18 U.S.C. § 1956(a)(1) prohibits:

a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity; or ... knowing that the transaction is designed in whole or in part to conceal or disguise ... the proceeds of specified unlawful activity.

Among the offenses included in the definition of "specified unlawful activity" are violations of 18 U.S.C. § 1341 (mail fraud).

The mail fraud statute, 18 U.S.C. § 1341, provides, in relevant part, that a person is guilty of mail fraud if:

having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, [the person] places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service.

 The crux of mail fraud is "an intent to defraud." *U.S. v. Bouyea,* 152 F.3d 192, 194 (2d Cir.1998); *U.S. v. Gabriel,* 125 F.3d 89, 96 (2d Cir.1997). To establish an intent to defraud, the Government must "prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (mail fraud and wire fraud) (quoting *United States v. Starr,* 816 F.2d 94, 98 [2d Cir. 1987] ); *see also In re Registry Publishing,* 68 F.3d at 580 ("In order to establish that the defendant acted with an intent to defraud, the Government must show that some actual harm or injury was contemplated by the schemer.") (internal quotation marks omitted); *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994).

## C. The Government's Showing of Probable Cause

 The direct and circumstantial evidence presented to the Court easily satisfies the Government's initial burden of showing "probable cause" that Wetterer committed mail fraud and money laundering and that there was a nexus between the defendant bank accounts, mail fraud and money laundering.

The Government proved the following facts by a preponderance of the evidence:

1. That Wetterer committed acts of sexual abuse to a number of boys at Mi Casa;

2. That Wetterer committed multiple and continuing acts of physical abuse to the boys at Mi Casa;

3. That the newsletters at issue contained false representations in that they affirmatively stated that Mi Casa was a safe haven for boys;

4. That the newsletters intentionally failed to advise potential contributors of the true conditions that occurred at Mi Casa and that such concealment of material facts constituted fraud;

5. That after he was accused of sexually abusing certain boys, Wetterer expressly denied the allegations in the newsletters of December 1988, March 1989, May 1989 and September 1990;

6. That substantial donations were made in response to the newsletters, which donations were mailed to the organization that collected money for Mi Casa and ultimate-

ly were deposited in accounts controlled by Wetterer; and

7. That if the contributors knew of the sexual and physical abuse, they would not have made the contributions.

8. That Wetterer engaged in financial transactions with the Bank of America account no. 05616 and with the Sterling Bank accounts involving the proceeds of the above-described mail fraud;

9. That Wetterer knew that the funds involved in these financial transactions represented the proceeds of mail fraud; and

10. That Wetterer engaged in these financial transactions with the intent to promote the mail fraud.

In sum, based on the "totality of the circumstances" (*In re Names Registry Publishing, Inc.*, 68 F.3d at 580), the Court finds probable cause to believe that Wetterer committed mail fraud and money laundering, and that there was a nexus between the defendant bank accounts and both these crimes.

As previously noted, once the Government has made such a showing, the burden shifts to the claimant to show, by a preponderance of the evidence, that the defendant property was not in fact used unlawfully and, therefore, is not subject to forfeiture, or that the defendant is an "innocent owner." *See U.S. v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d at 487; *United States v. Daccarett*, 6 F.3d at 57. The Court finds that the claimants did not carry their burden of proving that the defendant property was not used unlawfully and that it is not subject to forfeiture. Nor did the claimants prove that they were "innocent own." Accordingly, the Government has prevailed in this forfeiture action, as a matter of law.

As stated in the Court's findings of fact, the Court credits the direct and circumstantial evidence demonstrating that Wetterer physically and sexually abused numerous boys who resided at Mi Casa. Having had the opportunity to view the witnesses, hear their testimony, observe their demeanor, and evaluate their credibility, the Court finds that the Government has more than scaled its "probable cause" hurdle with respect to mail fraud and money laundering. By contrast, nothing

in the defendants' evidence dispelled the Government's compelling proof that Wetterer was responsible for the horrendous acts of sexual and physical abuse against boys in his charge, that Wetterer committed mail fraud and money laundering, and that the financial transactions involved in the defendant funds represented the proceeds of mail fraud. It necessarily follows from these findings that the defendants did not satisfy their burden of proving by a preponderance of evidence that the defendant property was not used unlawfully or that they are "innocent owners."

In view of the foregoing, the Court directs that judgment be entered in favor of the United States, and that the defendant funds on deposit shall be forfeited to the use and benefit of the United States.

## CONCLUSION

For the reasons set forth above, it is hereby

ORDERED, that judgment is granted in favor of the United States; and it is further

ORDERED, that the Clerk is directed to enter Judgment declaring that the defendant funds on deposit shall be forfeited to the use and benefit of the United States; and it is further

ORDERED, that the Clerk of the Court is directed to close this case.

SO ORDERED.